[Nos. 67549-0; 67786–7. En Banc.]
Argued March 1, 2000. Decided October 19, 2000.

JOHN POSTEMA, ET AL., *Appellants*, v. THE POLLUTION CONTROL HEARINGS BOARD, ET AL., *Respondents*.
WALLACE L. JORGENSEN, ET AL., *Appellants*, v. THE POLLUTION CONTROL HEARINGS BOARD, ET AL., *Respondents*.

*Richard E. Jonson* (of *Jonson & Jonson, P.S.*); *Charles W. Lean* (of *Perkins Coie*); *Kameron C. Cayce* (of *Kameron C. Cayce & Associates*); and *Richard M. Stephens* and *Charles A. Klinge*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Jean M. Wilkinson* and *Deborah L. Mull, Assistants*; *John B. Arum* (of *Ziontz, Chestnut, Varnell, Berley & Slonim*); *Mason D. Morisset*; *Robert N. Caldwell*; *Russell W. Busch*; *Gregory A. Hicks*; and *Karen Allston* (of *Muckleshoot Indian Tribe*), for respondents.

MADSEN, J. — These two consolidated cases, one of which

involves four consolidated cases, present numerous issues arising from the Department of Ecology's denial of applications for groundwater appropriation permits on the basis that the groundwater sources are in hydraulic continuity with surface water sources and further appropriations are foreclosed under the criteria of RCW 90.03.290. In the five individual cases before this court, the Pollution Control Hearings Board upheld Ecology's denial of the groundwater applications.

We conclude that hydraulic continuity between groundwater and a surface water source with unmet minimum flows or which is closed to further appropriation is not, in and of itself, a basis on which to deny an application to withdraw groundwater. However, despite the Board's erroneous legal determination that hydraulic continuity equates to impairment as a matter of law, the Board's findings in two of the cases before us nevertheless support the Board's ultimate decision that denial was proper.

These cases have proceeded, in both the administrative appeals and superior court review, in two parts. First, the Board addressed statewide threshold issues common to these and other appeals. Then, individual hearings were held in each case. The superior courts similarly addressed the threshold issues and the individual issues raised in each case. We affirm the decisions of the King County Superior Court and the Snohomish County Superior Court on the threshold issues, and affirm the courts' orders in *Jorgensen v. Department of Ecology*, No. 97-2-17943-2 (King County Super. Ct. Sept. 14, 1998); *Black River Quarry, Inc. v. Department of Ecology*, No. 96-2-20613-0 (King County Super. Ct. Sept. 14, 1998); and *Postema v. Department of Ecology*, No. 97-2-00979-9 (Snohomish County Super. Ct. Aug. 18, 1998). Our affirmance in *Postema* results in remand of that case to the Board. We reverse the orders in *Covington Water District v. Department of Ecology*, No. 97-2-17946-7 (King County Super. Ct. Sept. 14, 1998) and *Herzl Memorial Park v. Department of Ecology*, No. 97-2-

17932-7 (King County Super. Ct. Sept. 14, 1998) and remand these cases to the Board.

We first address the threshold issues common to these cases, and then turn to each of the individual cases.

## THRESHOLD ISSUES

### Facts

In late 1995 and early 1996, the Department of Ecology (Ecology) issued approximately 600 water right decisions on applications to appropriate water in 12 watersheds, using batch processing. A little over half of these decisions were denials. Over 130 of the decisions were appealed to the Pollution Control Hearings Board (Board), which consolidated most of the appeals by Watershed Resource Inventory Area (WRIA). Many of these appeals involved denials of applications for groundwater appropriation permits on the basis that the groundwater is in hydraulic continuity with surface water sources which have minimum flows which are not met a substantial part of the time. In addition, Ecology denied applications for appropriation from groundwater in hydraulic continuity with surface water sources which are closed to further appropriation. Importantly, in the five cases here on appeal, Ecology gave several reasons for denial of applications, but its decision in each case was ultimately premised on hydraulic continuity.

A number of the applicants who appealed to the Board, the Coordinated Appellate Group (CAG), moved for and were granted a special hearing on threshold issues of statewide importance. In addition to CAG, Ecology, and intervenors Center for Environmental Law and Policy, the Muckleshoot Indian Tribe, and the Tulalip Tribes of Washington participated in the briefing and argument. The tribes' treaty rights are not directly at issue in these cases, but their treaty rights form the basis for their interest in these cases. The Board conducted the hearing, addressing 11 threshold issues of law, and on July 16, 1996, issued an

order on motions for summary judgment and partial summary judgment. Thereafter, the Board held evidentiary hearings in the individual cases and issued orders in each case. A number of the applicants appealed the Board's decisions, and a number of the appeals were assigned to King County Superior Court Judge Alsdorf. Included in this group of appellants are all of the appellants in one of the two consolidated cases before the court, *Jorgensen v. Pollution Control Hearings Board*, No. 67786-7 (which itself involves four cases consolidated by the Court of Appeals before transfer to this court). Appellant John Postema, the appellant in the second of the consolidated cases, *Postema v. Pollution Control Hearings Board*, No. 67549-0, appealed to Snohomish County Superior Court. The superior courts affirmed the Board in most respects on the threshold issues. In the individual orders, the denials of groundwater appropriation permits in the four Jorgensen consolidated cases were upheld, while Postema prevailed on appeal and his case was remanded to the Board for a new hearing.

No attempt is made here to fully explain hydrogeological cycles and the science relating to impact of groundwater withdrawals. In general, water can move from groundwater to surface water, as well as from surface water to groundwater. How groundwater moves and where it moves to depend on several factors, including gravity, saturation of the ground materials, the hydraulic gradient, the level of the groundwater, and the type of material through which it moves. An aquifer is a geologic formation having materials with a higher rate of conductivity. An aquitard is composed of materials with lower conductivity. While at one time it was thought that aquitards could be impermeable, it is now known that an aquitard is never truly impermeable. Pumping well water can affect groundwater movement by lowering pressure and heads, by reducing groundwater storage, and by changing rates of groundwater recharge and discharge. The interrelationship can be quite complex and effects are sometimes difficult or impossible to measure in the field. Also, pumping groundwater may not have a

discernable effect on surface water until considerable time has passed, depending upon the conditions.

Ecology's understanding of hydraulic continuity has altered over time, as has its use of methods to determine hydraulic continuity and the effect of groundwater withdrawals on surface waters. In 1996, the United States Geologic Service published a report by Morgan and Jones regarding three-dimensional computer modeling for the complex geologic and hydrogeologic basins of Puget Sound. The report concluded that the effects of pumping always reaches some of the surface water boundaries, and can do so over many square miles. Prior to issuance of this report, there was no such model. Ecology maintains that in a complex hydrologic system, use of a three-dimensional computer model is the best method for determining the effects groundwater withdrawals will have on surface water flow and senior surface water right holders. Ecology concluded that the Morgan and Jones model could be used in decisions on the Jorgensen appellants' applications because the climate, topography, and geology in the Green-Duwamish, Snohomish, and Cedar-Sammamish watersheds were similar.

Although there has been a factual dispute regarding the extent of the impact of groundwater withdrawals on surface waters in western Washington in general, especially given the rates of recharge resulting from precipitation, the arguments on the statewide threshold orders concern issues of law.

## Analysis

The Board and the superior courts decided the statewide threshold issues as matters of law on summary judgment. Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

The Administrative Procedure Act, chapter 34.05 RCW (APA), governs proceedings before the Pollution Con-

trol Hearings Board. *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 589, 957 P.2d 1241 (1998). This court sits in the same position as the superior court and reviews the Board's decision by applying the standards of review in RCW 34.05.570 directly to the agency record. *Id.* Agency action may be reversed where the agency has erroneously interpreted or applied the law, the agency's order is not supported by substantial evidence, or the agency's decision is arbitrary and capricious. RCW 34.05.570(3); *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 776, 947 P.2d 732 (1997).

Where construction of statutes is concerned, the error of law standard applies. *Id.*; RCW 34.05.570(3)(d). Under this standard, this court may substitute its interpretation of the law for the agency's. *R.D. Merrill Co. v. Pollution Control Hr'gs Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999). Where a statute is within the agency's special expertise, the agency's interpretation is accorded great weight, provided that the statute is ambiguous. *Theodoratus*, 135 Wn.2d at 589; *Pasco Police Officers' Ass'n v. City of Pasco*, 132 Wn.2d 450, 458, 938 P.2d 827 (1997); *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 627-28, 869 P.2d 1034 (1994). However, an agency's view of the statute will not be accorded deference if it conflicts with the statute. *Id.* at 628. Ultimately, it is for the court to determine the meaning and purpose of a statute. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

The burden of establishing invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a) ; *City of Redmond*, 136 Wn.2d at 45.

I. Hydraulic continuity with surface water source having minimum flow requirements

The primary issues common to these appeals concern the impact of groundwater withdrawals on surface waters having minimum flow requirements set by rule which are unmet a substantial part of the year, and on surface waters closed to further appropriation. The parties do not disagree

that groundwater and surface water may be interconnected and that withdrawals from aquifers may affect surface water flows or levels. They disagree, however, on the nature of minimum flow rights and on what constitutes legally significant hydraulic continuity,[1] as well as on whether hydraulic continuity requires denial of a groundwater application on the basis that a proposed withdrawal will impair existing rights, including minimum flow rights, or will be detrimental to the public welfare. Appellant Postema contends that there must be a significant measurable effect on surface waters before a groundwater application may be denied even though hydraulic continuity between the ground and surface waters is established. In general, the appellants in the Jorgensen cases argue that minimum flows are limited rights, and that Ecology's regulations require a direct and measurable effect of groundwater withdrawal on surface waters using standard stream measuring equipment, which has effective limits of about five percent of stream flow, before hydraulic continuity has any legal significance vis-à-vis minimum flow rights. If, using these methods, no effect is measurable, these appellants reason, Ecology has no authority to deny a groundwater application because of any affect on or relationship to surface waters.

Both the Board and the superior courts ruled against appellants, reasoning that Ecology's regulations do not require or foreclose use of current scientific tools to determine hydraulic continuity and impact of groundwater withdrawal. The Board held that once hydraulic continuity between a groundwater source and surface water having unmet minimum flows is established, any ground withdrawals will impair existing rights and thus permit applications must be denied as a matter of law. The superior courts rejected the Board's holding, reasoning instead that hydraulic continuity is a factual determination which does not, in and of itself, establish impairment. Rather, water

---

[1] The term "hydraulic continuity" is not found in any of the statutes, although it is used in some administrative rules. *E.g.*, WAC 173-501-060.

applicants must have the opportunity to present their factual cases on the question of impairment or any of the other criteria justifying denial of a water application. If Ecology wants to avoid a factual hearing on impairment in each case, it must engage in rule making. Ecology has not cross-appealed the superior courts' holdings that hydraulic continuity alone does not equate to impairment.

To place the issues in context, we begin with general water law principles. The doctrine of prior appropriation applies when an applicant seeks to obtain a water right in this state. RCW 90.03.010; *Neubert v. Yakima-Tieton Irrigation Dist.*, 117 Wn.2d 232, 240-41, 814 P.2d 199 (1991). Under this doctrine, a water right may be acquired where available public water is appropriated for a beneficial use, subject to existing rights. RCW 90.03.010. The same principles apply to groundwater: "Subject to existing rights, all natural groundwaters of the state . . . are hereby declared to be public groundwaters and to belong to the public and to be subject to appropriation for beneficial use under the terms of this chapter and not otherwise." RCW 90.44.040; *see Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997). When a private party seeks to appropriate groundwater, Ecology must investigate pursuant to RCW 90.03.290. *See* RCW 90.44.060 (providing that groundwater applications shall be made as provided for in RCW 90.03.250 through .340). RCW 90.03.290 requires that before a permit to appropriate may be issued, Ecology must affirmatively find (1) that water is available, (2) for a beneficial use, and that (3) an appropriation will not impair existing rights, or (4) be detrimental to the public welfare. A basic principle of water rights acquired by appropriation is the principle of first in time, first in right. "[T]he first appropriator is entitled to the quantity of water appropriated by him, to the exclusion of subsequent claimants . . . ." *Longmire v. Smith*, 26 Wash. 439, 447, 67 P. 246 (1901); *see* RCW 90.03.010 (codifying first in time, first in right prin-

ciple); *Neubert*, 117 Wn.2d at 240.[2] A decision whether to grant a permit to appropriate water is within Ecology's exercise of discretion. *Hillis*, 131 Wn.2d at 384; *Jensen v. Dep't of Ecology*, 102 Wn.2d 109, 113, 685 P.2d 1068 (1984).

The groundwater code recognizes that surface waters and groundwater may be in hydraulic continuity:

> The rights to appropriate the surface waters of the state and the rights acquired by the appropriation and use of surface waters shall not be affected or impaired by any of the provisions of this supplementary chapter and, to the extent that any undergroundwater is part of or tributary to the source of any surface stream or lake, or that the withdrawal of ground water may affect the flow of any spring, water course, lake, or other body of surface water, the right of an appropriator and owner of surface water shall be superior to any subsequent right hereby authorized to be acquired in or to ground water.

RCW 90.44.030. This statute "emphasizes the potential connections between groundwater and surface water, and makes evident the Legislature's intent that groundwater rights be considered a part of the overall water appropriation scheme, subject to the paramount rule of 'first in time, first in right.'" *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 226 n.1, 858 P.2d 232 (1993). Hydraulic continuity between ground and surface waters is also recognized in the Water Resources Act of 1971: "Full recognition shall be given in the administration of water allocation and use programs to the natural interrelationships of surface and groundwaters." RCW 90.54.020(9).

Accordingly, when Ecology determines whether to issue a permit for appropriation of public groundwater, Ecology must consider the interrelationship of the groundwater with surface waters, and must determine whether surface

---

[2] Normally, the priority date for a water right which has been perfected relates back to the date of application for the permit. RCW 90.03.340; *R.D. Merrill Co. v. Pollution Control Hr'gs Bd.*, 137 Wn.2d 118, 132, 969 P.2d 458 (1999). However, where minimum flow or levels have been adopted and are in effect when a permit to appropriate is granted, the permit must be conditioned to protect the flows or levels. Thus, the date of approval of the permit, not the date of application, dictates whether the water right is subject to the minimum flows or levels.

water rights would be impaired or affected by groundwater withdrawals.

RCW 90.22.010 and .020, enacted in 1969, LAWS OF 1969, 1st Ex. Sess., ch. 284, §§ 3, 4, authorize Ecology to establish, by rule, minimum instream flows or levels to protect fish, game, birds, other wildlife resources, and recreational and aesthetic values. Then, in 1971, as part of the Water Resources Act, establishment of base flows in rivers and streams was mandated by RCW 90.54.020(3)(a), which provides in part: "The quality of the natural environment shall be protected and, where possible, enhanced[3] as follows: . . . Perennial rivers and streams of the state shall be retained with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values." RCW 90.54-.040 authorizes Ecology to establish by rule a comprehensive state water resources program for making future water allocation and use decisions. Pursuant to this authorization, Ecology adopted rules establishing the WRIAs and minimum flows at issue in these cases.

Once established, a minimum flow constitutes an appropriation with a priority date as of the effective date of the rule establishing the minimum flow. RCW 90.03.345. Thus, a minimum flow set by rule is an existing right which may not be impaired by subsequent groundwater withdrawals. RCW 90.03.345; RCW 90.44.030. The narrow exception to this rule is found in RCW 90.54.020(3)(a), which provides that withdrawals of water which would conflict with the base flows "shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served."

Appellants in the Jorgensen case contend that before a groundwater application may be denied because of impairment of surface water rights, there must be a direct and

---

[3] The Jorgensen appellants contend that Ecology has no authority to enhance protection of fisheries and other environmental values, but RCW 90.54.020(3) is clearly to the contrary. Respondent Tulalip Tribes particularly urge that this authority exists. None of Ecology's decisions in this case involve attempts at enhancement, though.

measurable effect on surface waters using standard stream measuring equipment. The limits of this equipment are about five percent of the stream flow. Appellants reason that when adopting rules setting minimum flows Ecology was required to balance instream and out-of-stream uses, and, in particular, to give consideration to economic factors. According to appellants, when Ecology adopted the WRIA regulations it was required to and did in fact weigh competing interests in future water use and defined *limited* minimum flow water rights, containing a "direct, and measurable impact" standard in order to account for, among other things, economic factors. Key to appellants' argument is the belief that the rules setting the minimum flows do not alone define the minimum flow rights; instead, all the regulations pertaining to the water basin in question define the minimum flow rights.

We disagree. First, and most importantly, the statutes simply do not support appellants' view. The statutes plainly provide that *minimum flows*, once established by rule, are *appropriations* which cannot be impaired by subsequent withdrawals of groundwater in hydraulic continuity with the surface waters subject to the minimum flows. RCW 90.03.345; RCW 90.44.030. A minimum flow is an appropriation subject to the same protection from subsequent appropriators as other water rights, and RCW 90.03.290 mandates denial of an application where existing rights would be impaired.

Second, these appellants cite no statute which requires any further weighing of interests once minimum flows have been established, and none requiring that economic considerations influence permitting decisions once minimum flows are set. Several statutes recognize that water is essential to the state's growing population and economy as well as necessary to preserve instream resources and values. RCW 90.54.010(1)(a); RCW 90.03.005 (describing policy of water use yielding maximum net benefits from both diversionary use of waters and retention of water instream to protect natural values and rights); RCW

90.54.020(2) (generally same); *see also* RCW 90.82.010; RCW 43.21C.030(2)(b) (State Environmental Policy Act); RCW 43.21H.010 (state economic policy act). However, none of these statutes indicate that they are meant to override minimum flow rights once established by rule, none conflict with the statutes authorizing or mandating rules setting minimum flows, and none conflict with the specific statutes respecting priority of minimum rights.

Third, even if the WRIA regulations could be read as establishing a limited minimum flow right (which, as explained below, they do not do), they would be inconsistent with the statutes and invalid. *See Winans v. W.A.S., Inc.*, 112 Wn.2d 529, 540, 772 P.2d 1001 (1989) (regulations must be consistent with statutes under which they are promulgated); *Baker v. Morris*, 84 Wn.2d 804, 809-10, 529 P.2d 1091 (1974) (agency exceeds its rule-making authority to the extent it modifies or amends precise requirements of statute).

Finally, the relevant rules do not establish the standard for which the Jorgensen appellants argue. Chapter 173-500 of the Washington Administrative Code (WAC) sets out the general guidelines for administering the water resources management program required under the Water Resources Act of 1971. *See* WAC 173-500-010. Appellants first point to WAC 173-500-060(5)(a), a general provision which states:

(5) **Base flow provisions for water rights**.

(a) Surface water and/or groundwater appropriation permits, issued subsequent to the effective dates of chapters 173-501 through 173-599 WAC, that will allow either direct diversion from or have a measurable effect on streams where base flow limitations of this chapter [sic], and any such permits or certificates shall be appropriately conditioned to assure maintenance of said base flows.

Contrary to appellants' arguments, this rule, which is obviously missing some language, does not limit the scope of instream flow regulation, nor does it dictate that permits must be issued, albeit conditioned. The rule simply does not address *whether* a permit may or may not be issued, and

plainly could not modify the statutory requirements of RCW 90.03.290. If the statute's requirements are not satisfied, a permit cannot be issued and the rule never comes into play. The rule provides that if a permit is issued for a surface water source for which minimum flows have been set, the permit may have to be conditioned to assure maintenance of the base flows. Such a situation could arise, for example, where a stream which has unmet minimum flows part of the year nevertheless has sufficient water during high flow periods of the year to allow for issuance of a conditioned permit allowing appropriation of water at a time or in a manner which will not impair existing rights.

The Jorgensen appellants also rely on rules concerning specific WRIAs. The chapters addressing the different WRIAs usually follow a general format where, among other things, they list streams with minimum flows and describe the minimum flow requirements, and also list stream closures. Following these listings are several provisions, including a provision concerning groundwater. Appellants urge that the groundwater regulations for all basins where minimum flows have been set should be interpreted the same, and point to language in the regulation respecting the Puyallup River Basin, WAC 173-510-050, as a specific rule expressly providing the correct interpretation. Postema makes a similar argument. Ecology also argues that there is a consistent interpretation of all the rules which should be followed, but advances a different interpretation, i.e., one which reflects language in the regulation pertaining to the Okanogan River Basin, WAC 173-549-060.

The parties' arguments concerning the groundwater regulations largely overlook the relevant statutory scheme. Also, the parties have for the most part read meanings into the regulations which are simply not supported by the language contained in them. They also have selectively chosen rules which most closely reflect their respective positions. Ultimately, we are unconvinced by the parties' arguments urging their respective versions of a consistent interpretation applying to all WRIAs.

The Jorgensen appellants reason that because Ecology agrees that it intended the same meaning be given the groundwater regulations for all basins where minimum flows have been set, it is legitimate to use similar, but "more precise" language from an unrelated basin as an aid in interpretation. Of course, the language which they rely on as more precise is language that comes closer to supporting their position than the regulations applying to the WRIAs actually involved here. These appellants quote WAC 173--507-040, applicable to the Snohomish River Basin, WRIA 7, as a general statement, and WAC 173-510-050, applicable to the Puyallup River Basin, WRIA 10, as "a more precise guide to interpretation." Br. of Appellant (Jorgensen) at 32.

WAC 173-507-040, the Snohomish rule, states that "[i]n future permitting actions relating to groundwater withdrawals, the natural interrelationship of surface and groundwaters shall be fully considered in water allocation decisions to assure compliance with the meaning and intent of this regulation." As appellants concede, this regulation does no more than repeat the mandate of RCW 90.54-.020(9). Thus, it does not advance their arguments.

The Puyallup rule, WAC 173-510-050, however, states that Ecology will determine whether the proposed withdrawal will have a "direct, and measurable" impact on flows in streams with minimum flows and those closed to further appropriation, and then states that, if so, the provisions setting the minimum flows and stream closures will apply. Although more in accord with appellants' argument, this rule does not tie "measurable impact" to standard stream measuring devices.

Postema also refers to the Puyallup rule, as well as to those of other basins in arguing a consistent interpretation of the rules contrary to Ecology's position. He does not argue, as the Jorgensen appellants do, that standard stream measuring devices with limits of five percent must establish a direct and measurable effect on stream flow before groundwater applications must be denied under RCW 90.03.290. Instead, he contends that the rules require

a significant measurable or otherwise detectable effect on surface waters,[4] relying upon WAC 173-500-060. Further, he urges that the mere existence of instream flows and hydraulic continuity is not enough to warrant denial of a groundwater application under the regulations in effect, nor is a de minimis impact sufficient to deny a groundwater right application. As noted, WAC 173-500-060 does not support his position.

Ecology claims that it has uniformly applied its rules to require only "significant hydraulic continuity." While it is true that interpretation of regulations is purely a question of law, *St. Francis Extended Health Care v. Department of Social & Health Services*, 115 Wn.2d 690, 695, 801 P.2d 212 (1990), and that deference to the agency's interpretation is particularly appropriate where its own regulations are concerned, *Hayes v. Yount*, 87 Wn.2d 280, 289, 552 P.2d 1038 (1976), the rules do not contain a general "significant hydraulic continuity" standard applying to all basins any more than they contain a "direct, and measurable impact" standard. Like the "direct, and measurable, impact" language relied upon by appellants which appears in a rule for the Puyallup River basin, WAC 173-510-050, the "significant hydraulic continuity" language appears in a rule, WAC 173-549-060, for a basin not involved in these appeals, i.e., the Okanogan River Basin, WRIA 49. The language of that rule was at issue in *Hubbard v. Department of Ecology*, 86 Wn. App. 119, 936 P.2d 27 (1997), and the court held that the term referred to the continuity between the groundwater aquifer and the surface water, not to the degree of impact on the surface water, and upheld a conditional permit subject to maintenance of minimum flows.

Both the King County and Snohomish County Superior Courts applied the rules specific to the basins in which appropriations were sought, rejecting all parties' argu-

---

[4] Postema agrees that there may be many ways to measure the effects of groundwater withdrawal on surface waters, but contends that Ecology has taken the position that there is no need to measure effects because even unmeasurable effects constitute impairment.

ments of a consistent interpretation across all basins. While there is some appeal to the idea that all of the rules should mean the same thing therefor, we too decline to search for a uniform meaning to rules that simply are not the same.

Appellants urge, however, that at the least the rules respecting WRIAs and groundwater withdrawals are ambiguous as to Ecology's intent about the nature of the right embodied in the minimum flows, and urge that the ambiguity may be resolved by resort to evidence of Ecology's intent when promulgating the rules. They chiefly rely on the declaration of Eugene Wallace, former Assistant Director of Ecology, who maintained that Ecology's intent in adopting WAC 173-500-060(5)(a) was that the surface water restrictions adopted in the regulations would have no effect on future groundwater withdrawals unless there was a measurable effect on minimum flows. Mr. Wallace said that Ecology expected that the effect of groundwater withdrawals would be confined to nearby withdrawals from shallower aquifers. Appellants then rely on the statement of a witness for Ecology, Mr. Wildrick, for the proposition that "measurement" refers to standard measuring equipment with limits of about five percent. Administrative R. at 236 (Resp't Ecology's Br. in Resp. to Mot. for Summ. J. re Statewide Issues, App. 2 (Decl. of Linton Wildrick, Pollution Control Hearings Board)). Appellants urge that this evidence, viewed in the light most favorable to them, supports the conclusion that Ecology intended the direct and measurable impact standard with limits of five percent.

The first difficulty with this argument is that appellants are not entitled to the benefit of any inferences from the evidence in this context. The statewide issues decided by the Board and the courts on summary judgment involve pure questions of law involving the meaning of statutes and rules. The second difficulty with the argument is that appellants misrepresent Mr. Wildrick's testimony. He said that

[u]nless the well captures approximately five percent (5%) of the stream flow, the effect cannot be accurately detected with

standard measuring equipment. Five percent of the flow of many streams exceeds the pumping rates of all but the largest wells . . . . For this reason, hydrologists usually estimate hydraulic properties based on standard aquifer testing and then calculate or model stream flow effects based on those properties. Extensive experimentation has proven that ground-water pumping affects stream flows even if the effects are not detectable due to the limitations of standard measuring equipment. These calculations of effects are considered to be accurate and have become standard professional practice. Hydrologists routinely "measure" or "ascertain" effects on surface water sources caused by wells in this manner.

*Id.* at 236-37.

Third, the argument would effectively freeze Ecology's ability to implement the statutes, requiring it to rely on scientific knowledge which is now outdated. Ecology concedes that when adopting minimum flow rules it did not believe that withdrawals from deep confined aquifers would have any impact on stream flows because of the presence of an aquitard. New studies by the United States Geologic Service have established that significant leakage occurs across aquifers, and thus withdrawals from deep aquifers will impact surface waters more than was thought—appellants do not dispute this. Nor can there be any serious thought that Ecology intended groundwater withdrawals be allowed to deplete surface streams; Ecology's aim has been to protect instream flows as required by statute. For example, as Ecology points out, the final environmental impact statement for the instream flow program states in part: "Adoption of an instream flow for a stream would mean that new public water demands would not be allowed to deplete that stream below the specified flow." T 1142.[5]

---

[5] The Jorgensen appellants also rely on 1980 guidelines published by Ecology to define significant hydraulic continuity. These guidelines were not promulgated as rules, and were repealed in 1989. The appellants urge that Ecology is bound by the guidelines. The King County Superior Court said the argument "verges on the frivolous." *Jorgensen v. Pollution Control Hearings Bd.*, No. 97-2-17943-2, slip op. at 18 (King County Super. Ct. Dec. 10, 1998). The court noted the document contained contradictory statements which made its intent difficult to determine, but that in any event if it ever had any effect, it has none on current or pending

As the King County Superior Court observed, "[i]t is true that all parties to this case originally expected that only nearby and shallow groundwater withdrawals would affect surface waters. However, expectation is not intent. While the undisputed facts show a change from the original manifestation of Ecology's intent, Ecology's intent was and is to prevent interference with instream flows." *Id.* at 14.[6] We agree with this reasoning. Moreover, it makes no sense to uniformly interpret the rules to require that standard instream gauges with five percent limits show a direct and measurable effect before an application to withdraw from groundwater in hydraulic continuity may be denied. It would not take many such withdrawals before a stream could be depleted—a result at odds with Ecology's intent, and, more importantly, at odds with the relevant statutes and the obvious legislative intent manifested in them. As intervenor/respondent Center for Environmental Law and Policy urges, an instream flow right subject to piecemeal impairment would not preserve flows necessary to protect fish, wildlife and other environmental resources. Not only would minimum flows be subject to depletion, all senior rights in a stream could be impaired by incremental impacts of groundwater withdrawals, none of which alone was "direct and measurable" under appellants' proposed standard.

Postema contends, though, that there is both statutory and regulatory support for his claim that a de minimis impact is not a valid ground for denying a groundwater permit application. As he points out, RCW 90.44.050 allows domestic and stock watering uses of up to 5,000 gallons without a permit, and WAC 173-508-080(2) (Green-Duwamish River Basin, WRIA 8, rule), exempts domestic use of water for a single family dwelling even where withdrawal is from a stream closed to further appropriation. Postema reasons that the statute and the rule are

---

applications. Aside from these observations, which are valid, Ecology views the document as technically obsolete, and it should accordingly not be used to define the meaning of Ecology's regulations.

[6] *Supra* note 5.

inconsistent with a conclusion that "no impairment" means any impairment at all, including a de minimis impairment.

RCW 90.03.290 does not, however, differentiate between impairment of existing rights based on whether the impairment is de minimis or significant. If withdrawal would impair existing rights, the statute provides the application must be denied. As to RCW 90.44.050, legislative exemptions from the permitting system do not determine what "impairment" means. As to Ecology's rule, Ecology says that it has determined that the single family dwelling exempted domestic use is pursuant to RCW 90.54.020(3)(a), which provides that groundwater withdrawals which would conflict with the base flows "shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served."

The Jorgensen appellants contend that the Pollution Control Hearings Board has already determined that minimum flow rights are not rights like other water rights, citing the Board's decision in *Wenatchee-Chiwawa Irrigation District v. Department of Ecology*, Pollution Control Hr'gs Bd. (PCHB) No. 85-215 (Apr. 7, 1986). Initially, a Board decision does not bind this court. *See R.D. Merrill Co.*, 137 at 142 n.9. Second, while the Board's decision in *Wenatchee-Chiwawa* appears to treat a minimum flow right differently than "traditional" water rights, the decision specifically concerned priorities under a 1985 statute reopening the registration period for water rights for a one-month period—and was expressly limited to that situation. When the Board was later faced with a question of priorities in general, it reasoned that "a minimum flow regime established by rule functions as an appropriation senior to all permits approved after it was established," and thus where minimum flows were in effect for a river before a junior appropriator's permits were approved, the junior appropriator had to cease diverting water when the river flow fell below the minimum flow set by rule. *Williams v. Dep't of Ecology*, PCHB No. 86-63 (Oct. 20, 1986).

The appellants also argue that it is normal for water rights to contain conditions and limitations. While that is

the case, it does not support the proposition that minimum flow rights are limited rights subject to impairment.

The appellants' arguments that there must be measurable effects on stream flows raise the question of how impairment must be determined. There seems to be no dispute that Ecology has revised its view of the interconnection of groundwater and surface water in hydraulic continuity as new information has become available. There is also no dispute that Ecology has altered the methods by which it determines the impact of groundwater withdrawal on surface waters. Ecology points to PCHB decisions upholding use of qualitative analysis, such as hydrological studies and conceptual modeling, and quantitative modeling, such as analytical equations or numeric models, *Richert v. Department of Ecology*, PCHB No. 90-158 (Sept. 11, 1991), and mathematical equations, *Richert* (citing *Anders v. Department of Ecology*, PCHB No. 78-38 (1978)).

Ecology may use new methods to determine impairment as they are developed. *See Am. Trucking Ass'ns v. Atchison, T.&S.F. Ry.*, 387 U.S. 397, 416, 87 S. Ct. 1608, 18 L. Ed. 2d 847 (1967) (administrative agencies are not required to, nor should they, regulate the present and future within the inflexible limits of yesterday); *Michigan v. Thomas*, 805 F.2d 176 (6th Cir. 1986) (Environmental Protection Agency could apply its definition of "reasonably available control technology" to disapprove proposed state dust rules where it had approved similar rules of other states, in light of new knowledge); *cf. Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n.20, 99 S. Ct. 790, 58 L. Ed. 2d 808 (1979) (deference due administrative agencies due in part because of willingness to accord some measure of flexibility to an agency as it encounters new and unforeseen problems over time).[7] Also, as the King County Superior Court reasoned, logically one cannot actually measure the impact of a well

---

[7] The King County Superior Court said: "The APA is not to be read in such a way as to prevent Ecology from using new scientific knowledge, whether it is a change in theory or in quantum of data. No party has a vested right in ignorance." *Jorgensen*, No. 97-2-17943-2, at 15.

which does not yet exist. That court said that the statutes and regulations do not prohibit use of modeling, and modeling may be the only means of quantifying effect, impact or conflict. As respondent Center for Environmental Law and Policy suggests, under the regulations measurability means ascertainable using the best available science.

Indeed, Ecology should not be able to rely on use of outdated methodology which would allow impairment of surface water rights. Using a method fraught with error potential where more scientifically acceptable methods exist would be inconsistent with the statutes prohibiting the grant of applications where impairment would occur. *Cf. Theodoratus*, 135 Wn.2d at 598 (Ecology's change from a system capacity measure of a water right to an actual beneficial use measure was not arbitrary and capricious where former was unlawful method contravening statutes).

We reject the Jorgensen appellants' claim that a direct and measurable impact on surface water must be shown using standard stream measuring devices before an application for a groundwater permit may be denied. We also reject Postema's argument that a significant measurable effect on stream flows is required. The relevant statutes and administrative regulations do not contain appellants' proposed standards, and they are inconsistent with the statutes' intent.[8] The statutes do not authorize a de minimis impairment of an existing right. RCW 90.03.290 plainly permits no impairment of an existing right. This does not mean, however, that there is no need to show any impact on the surface water resource, nor does it mean that measurement is irrelevant to the inquiry. As explained,

---

[8] ESHB 2050 (Wash. 1997), which was vetoed, would have provided for measurability in the field of the effect of groundwater withdrawals on surface waters and would have defined "impairment" of surface water rights by withdrawal of groundwater. Governor Locke's veto message states that "[h]ydrogeologists disagree about the bill's proposed methods and express concerns that if implemented, existing water uses could be negatively impacted. Ultimately, we do need a better definition of impairment, but this bill doesn't provide the answers we need." 1997 FINAL LEGISLATIVE REPORT, 55th Wash. Leg., Reg. Sess. at 168. The Governor's veto message is "strong evidence of intent" that measurement in the field is not mandated by current law. *See Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 594, 957 P.2d 1241 (1998).

though, Ecology is entitled to use more advanced techniques as they become available and scientifically acceptable. Applicants should then be provided the opportunity to challenge Ecology's factual determinations.

We also reject the Board's holding that hydraulic continuity, where minimum flows are unmet a substantial part of the year, equates to impairment of existing rights as a matter of law. As the King County Superior Court noted, existing rights may or may not be impaired where there is hydraulic continuity depending upon the nature of the appropriation, the source aquifer, and whether it is upstream or downstream from or higher or lower than the surface water flow or level, and all other pertinent facts.

Additionally, we reject the premise that the fact that a stream has unmet flows necessarily establishes impairment if there is an effect on the stream from groundwater withdrawals. The Board held that the number of days the minimum flow levels are not met may be considered in determining water availability, but declined to rule on whether it can be the sole consideration. The superior courts affirmed. The conclusion is correct. While the number of days minimum flows are unmet is a relevant consideration, it may be, for example, that due to seasonal fluctuations and time of withdrawal, groundwater withdrawal affecting the stream level will not impair the minimum flow rights. However, where minimum flows would be impaired, then an application must be denied.

We hold that hydraulic continuity of an aquifer with a stream having unmet minimum flows is not, in and of itself, a basis for denial of a groundwater application, and accordingly affirm the superior courts. However, where there is hydraulic continuity and withdrawal of groundwater would impair existing surface water rights, including minimum flow rights, then denial is required. Ecology may use new information and scientific methodology as it becomes available and scientifically acceptable for determining hydraulic continuity and effect of groundwater withdrawals on surface waters.

II. Hydraulic continuity with a stream closed to further appropriations by rule

In each of the rulings in the cases consolidated in Jorgensen, the Board ruled that as a matter of law Ecology could not grant a groundwater application for consumptive use where the groundwater is in hydraulic continuity with surface water which has been closed by rule. The King County Superior Court disagreed, holding that as in the case of streams with minimum flow rights, hydraulic continuity is a factual question which does not satisfy any of the criteria in RCW 90.03.290 for denying a water application. The Jorgensen appellants argue, as they do with respect to minimum flow rights, that hydraulic continuity alone is an insufficient ground for denial. Insofar as they contend that standard stream measuring devices, with five percent limits, must establish a direct and measurable impact on the surface water flow or levels, we disagree for the reasons discussed above.

The issue of hydraulic continuity and closed streams also arises in Postema's case. His arguments respecting the kind and degree of impact which must be established apply to closed streams as well as to those with minimum flows, and for the reasons discussed above, do not prevail.

Appellants in Jorgensen also contend that a stream closure is not a water right entitled to protection. They point out that RCW 90.03.345, which provides that minimum flows constitute appropriations, does not refer to stream closures or to fisheries code provisions forming the basis for most of the stream closures. Ecology agrees that a stream closure is not an appropriation, but is rather a recognition that the water in the stream is insufficient to meet existing rights and provide adequate base flows. Thus, where a proposed withdrawal would reduce the flow in surface waters closed to further appropriations, denial is required because water is unavailable and withdrawal would be detrimental to the public welfare.

Ecology is required to protect surface waters in order to preserve the natural environment, in particular "base flows

necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values." RCW 90.54.020(3)(a). Ecology also has authority to close streams to further appropriation. *See* RCW 43.21A.064(9) (authorizing promulgation of rules governing administration of Chapter 90.03 RCW); RCW 43.27A-.090(7), (11) (authority to promulgate rules respecting future water use); RCW 90.54.040 (authority to adopt rules related to future allocation decisions to implement intent of Water Resources Act of 1971); RCW 90.03.247 (Ecology with authority to set minimum flows, levels, or restrictions). Pursuant to this authority, Ecology has adopted rules closing certain streams following a determination that water is unavailable from the surface water source. *E.g.,* WAC 173-507-030(2) (Snohomish WRIA closure).

Stream closures by rule embody Ecology's determination that water is not available for further appropriations. Since this is a basis on which a water permit application must be denied under RCW 90.03.290 independent of the question whether a withdrawal would impair an existing right, we hold that a proposed withdrawal of groundwater from a closed stream or lake in hydraulic continuity must be denied if it is established factually that the withdrawal will have any effect on the flow or level of the surface water.

III. Rule Making

There are two rule-making questions raised in these cases. The first, raised by Postema, is whether Ecology was required to engage in rule making before using watershed assessments and priorities in its decisions and batch processing applications in a similar if not identical manner. The second, raised by all appellants, is whether Ecology departed from standards in its existing regulations or from its interpretation of existing regulations without engaging in required rule making.

Relying on *Hillis*, 131 Wn.2d 373, Postema argues that Ecology's use of watershed assessments and priorities, and its batch processing of hundreds of applications violates the

Administrative Procedure Act (APA) because Ecology did not engage in rule making.

RCW 34.05.570(2)(c) provides that agency rules adopted without compliance with statutory rule-making procedures are invalid. If agency action falls within the APA's definition of a rule, the agency must engage in rule making. *Hillis*, 131 Wn.2d at 398. In relevant part, "rule" means "any agency order, directive, or regulation of general applicability . . . which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law . . . ." RCW 34.05-.010(16)(c). In *Hillis*, 131 Wn.2d 373, the court concluded that Ecology's decisions regarding priorities of applications, its use of watershed assessments for the purpose of making decisions on applications, and the ranking of watersheds for assessment require rule making where these actions are new requirements or qualifications for decisions on applications. *Id.* at 398-401. Postema contends that Ecology's actions in his case are the same as in *Hillis*, and Ecology failed to engage in formal rule making.

There is a significant distinction between Postema's case and the holding in *Hillis*. Here, there was an individual investigation and decision, and use of priorities, watershed assessments, and ranking of watersheds did not serve as conditions to the decision in this case. Further, as Ecology points out, the decision in Postema's case does not depend on the evidence gathered in the basin assessments. Instead, Postema's own evidence provided the basis on which his application was ultimately denied.

Postema claims, though, that Ecology's batch processing replaces individualized decision making with a mass-produced process substituting presumed hydraulic continuity and presumed impairment of unmet instream flows. He also argues that instead of a thorough investigation, he and other applicants were given only a conclusory decision by Ecology, and suggests that Ecology's new procedure is to provide a more thorough investigation only after an applicant appeals the decision.

The King County Superior Court addressed this issue in its order on the statewide issues. That court said that batch processing is not prohibited by *Hillis* so long as it is not a precondition to the processing of an individual application, but added that "[b]atch processing does not meet APA standards simply by declaring identical findings of fact in a series of cases. The applicant in each case must be given a meaningful opportunity to contest each of those proposed findings . . . . In order to avoid repetitive hearings, and establish a series of findings as generally applicable and not subject to further challenge, Ecology must proceed by rule." *Jorgensen*, No. 97-2-17943-2, at 20. We agree. Here, however, Postema has had an opportunity to contest Ecology's factual determinations.[9]

Turning next to the Jorgensen appellants' arguments that Ecology has drastically altered the basis for its decisions on groundwater applications, the underlying premise is that Ecology's regulations require a direct and measurable impact using standard stream equipment before Ecology could deny any application based upon hydraulic continuity between a groundwater aquifer and surface water. When, in appellants' view, Ecology departed from this interpretation of its regulations and began relying on hydraulic continuity alone, it did so without engaging in required rule making. Postema makes a similar argument, contending that Ecology has changed from a "measurable effect" standard of impairment to a "no measurable effect" standard without a rule change.

Ecology cannot change to a standard of "hydraulic continuity." Hydraulic continuity is not the legal standard, "no impairment" is. The statutory requirement is that there be no impairment of existing rights, and administrative rules and regulations cannot amend or change statutory requirements. *Theodoratus*, 135 Wn.2d at 600. Accordingly, Ecology could not engage in rule making to adopt a standard

---

[9] We held in *Hillis* that Ecology's decision to batch process applications by watershed is not arbitrary or capricious or beyond its statutory authority. *Hillis*, 131 Wn.2d at 391.

which is unlawful, and did not violate the APA rule-making provisions by failing to do so.

Appellant Postema also argues that WAC 173-500-070 requires an open public process where revisions to rules are considered because new information or changing conditions makes it necessary. The Jorgensen appellants similarly rely on WAC 173-509-090, WAC 173-508-100 and WAC 173-507--080, which, as to each WRIA involved here, mirror WAC 173-500-070. *See also* RCW 90.54.020(10). The existing rules do not require revision, however. The groundwater regulations for the relevant river basins, WAC 173-507-040, WAC 173-508-050 and WAC 173-509-050, are consistent with the statutes they implement.

We hold that Ecology did not fail to engage in required rule making in Postema's case. Ecology did not use watershed assessments and priorities as preconditions to an investigation and decision, nor did its batch processing prevent Postema from factually challenging the decision on his application. We hold Ecology is not required to engage in rule making in order to make decisions applying the criteria of RCW 90.03.290, using new information about hydraulic continuity and using new methods to more accurately determine the impact of groundwater withdrawals on surface waters. However, Ecology cannot rely on hydraulic continuity alone to conclude that impairment to existing rights would result from groundwater withdrawal, and necessarily is not to be faulted for failing to propound a rule establishing hydraulic continuity as equivalent to impairment or any other criteria in RCW 90.03.290.

IV. Public Trust Doctrine

The Board considered the public trust doctrine in the ruling on the statewide issues. The superior courts found no need to address the public trust doctrine in light of the statutes establishing clear duties and standards respecting the public welfare or public interest.

Appellant Postema wants this court to reverse the Board's ruling that the public trust doctrine applies to

Ecology's decisions on groundwater applications. The appellants in Jorgensen contend that the Board's consideration of the public trust doctrine is a major error requiring remand.

 Ecology's enabling statute does not permit it to assume the public trust duties of the state; the doctrine does not serve as an independent source of authority for Ecology to use in its decision making apart from code provisions intended to protect the public interest. *R.D. Merrill*, 137 Wn.2d at 134; *see Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 232, 858 P.2d 232 (1993).[10]

However, because the statutes provide the standards for resolution of the legal issues here, remand is not necessary.

V. Cumulative Impacts

In its ruling on the statewide threshold issues, the Board ruled that where an application is made for groundwater which is in hydraulic continuity with a stream subject to minimum flows, Ecology could "look forward to the cumulative effect of similar future applications to determine the extent of harm to the environmental value at stake" under the public interest test of RCW 90.03.290. *In re Appeals From Water Rights Decisions of the Dep't of Ecology*, PCHB Nos. 96-8; 96-11; 96-16; 96-18; 96-20 through -31; 96-33 through -37; 96-39; 96-41 through -44; 96-46 through -50; 96-52 through -98; 96-100 through -111; 96-113 through -127; 96-129; 96-131 through -134; 96-136; 96-138; 96-139; 96-141; 96-143 through -146; 96-148; 96-150; 96-152 through -154; 96-156; 96-157; 96-160; 96-163 through -166; 96-169; 96-170; 96-176; 96-181, at 29 (July 17, 1996). The statute directs denial of applications which would be detrimental to the public welfare. The Board reasoned that the fact that an application would cause insignificant harm to

---

[10] Appellants also argue that the public trust doctrine is inapplicable to groundwater. While both *R.D. Merrill* and *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 858 P.2d 232 (1993), noted the doctrine has never been applied to nonnavigable groundwater, the cases now before the court do not involve just questions of groundwater. The central issues in these cases all concern hydraulic continuity of groundwater with surface waters, which may themselves be navigable waters.

fish habitat, for example, is not determinative, but whether the cumulative effects of the present application and similar future applications would cause significant harm is. The superior courts affirmed.

As Ecology correctly states, its denials in these cases were not based upon cumulative impacts. All of the challenged reasons for denial can be addressed without considering the question of cumulative impacts. We decline to reach the issue of cumulative future impacts.

## INDIVIDUAL APPEALS

On first reading, the King County Superior Court statewide order on the threshold issues seems to require reversal and remand in the first four of the individual appeals, those involving the Jorgensen appellants. The court held that Ecology and the Board had erroneously relied upon hydraulic continuity alone as the basis for denial of the groundwater permit applications. In fact, however, there were individual hearings before the Board and the appellants had the opportunity to challenge Ecology's factual determinations. Accordingly, there is a basis for review in each case.

The first three of the individual cases addressed below are cases where the Board's findings of fact are unchallenged. The findings are, accordingly, verities on appeal. *Haley v. Med. Disciplinary Bd.*, 117 Wn.2d 720, 728, 818 P.2d 1062 (1991); *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 30, 891 P.2d 29 (1995).[11] In the fourth case, *Herzl Memorial Park v. Department of Ecology*, No. 97-2-17932-7 (King County Super. Ct. Sept. 14, 1998) all but one of the findings are unchallenged.

In two cases involving the Jorgensen appellants, the Board's findings are sufficient to make a determination that denial of the applications was proper, despite the Board's

---

[11] Unless the superior court takes new evidence under RCW 34.05.562, its findings are not relevant in appellate review of an agency action. *Aviation W. Corp. v. Dep't of Labor & Indus.*, 138 Wn.2d 413, 422, 980 P.2d 701 (1999); *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 633-34, 869 P.2d 1034 (1994).

application of an erroneous legal standard. In the other two cases involving the Jorgensen appellants, the Board's findings and its application of an erroneous legal standard make it impossible to tell whether denial was proper, and accordingly those two cases require reversal and remand to the Board.

The decision to grant a groundwater application generally lies in Ecology's discretion, though it must deny an application if there is no unappropriated water available, if withdrawal will conflict with or impair existing rights, or if withdrawal will detrimentally affect the public interest. *Hillis*, 131 Wn.2d at 384.

I. *Jorgensen v. Department of Ecology* (Cascade Golf Course)

Facts. The rivers at issue, the Snoqualmie and the Snohomish, are in the Snohomish watershed, WRIA 7. The findings of fact establish the following: Instream flows were established on the Snoqualmie River at Snoqualmie and Carnation, and on the Snohomish River near Monroe. Since 1979, when the rule establishing minimum flows was adopted, the instream flows have not been met at Snoqualmie an average of 114 days a year and an average of 112 days a year at Carnation. Instream flows on the Snohomish have not been met near Monroe an average of 121 days a year. *Jorgensen v. Dep't of Ecology*, PCHB No. 96-57, Final Findings of Fact and Conclusions of Law and Order at 5 (Feb. 4, 1997). Groundwater pumping from aquifers in the Snoqualmie subbasin affects the water levels in wells and aquifers, as established by well records in WRIA 7. "Consumptive use of withdrawn groundwater either reduces groundwater discharge into surface waters or increases surface water recharge of aquifers, depending on the particular location, and in both instances diminishes stream flows both annually and seasonally." *See* Board Finding X, at 6-7.

Cascade Golf proposed to withdraw groundwater from a new well at a rate of 280 gallons per minute for irrigation of a 36-acre golf course located about 1/4 mile from the South Fork of the Snoqualmie River. The application was for a

consumptive use. Ecology denied the application. *See* Board Finding XI, at 7. (Though not stated by the Board, Ecology denied the application on the basis that water was not available, that existing rights would be impaired, and that the proposed withdrawal would be detrimental to the public welfare.) The well is completed at a depth of 160 feet, drawing water from an unconfined aquifer. The proposed well pumping would consume groundwater which would otherwise augment the instream flow of the Snoqualmie River. *See* Board Finding XII, at 7-8. Carnation, Snoqualmie and Monroe are down gradient from the proposed well. Decreasing groundwater flow that is above gradient from the Snoqualmie River would decrease groundwater flow down gradient, which would decrease groundwater discharge into the Snoqualmie River, which in turn would increase the number of days minimum instream flows on the Snoqualmie would not be met in the future. *See* Board Finding XIV, at 8-9.

The Board applied its legal determination that hydraulic continuity alone established impairment of the minimum flow rights on the Snoqualmie, given that the minimum flows were already unmet, and upheld denial of the Cascade Golf application. Based on the Board's unchallenged factual findings, the King County Superior Court affirmed. The court concluded that withdrawals of groundwater that conflict with, impair, or negatively affect the minimum flows set by rule cannot be authorized in the absence of overriding considerations of the public interest. *Jorgensen v. State*, No. 97-2-17943-2, slip op. at 11 (King County Super. Ct. Sept. 14, 1998). Because Cascade Golf had not alleged, much less proven, that the public interest exception applied, denial of its application was proper. *See* RCW 90.54.020(3).

While Cascade Golf appealed the superior court's decision, it does not raise any issues not addressed above in connection with the statewide threshold issues.

Analysis. Hydraulic continuity alone is not a sufficient basis for denial of the groundwater application. However,

the Board's unchallenged findings establish impairment of the minimum flows because groundwater which would otherwise flow into the Snoqualmie would be withdrawn by Cascade Golf, thus reducing stream flows already inadequate to meet minimum flows and increasing the number of days minimum flows would not be met. We affirm the superior court.

II. *Black River Quarry, Inc. v. Washington State Department of Ecology*

Facts. Ecology denied Black River Quarry's applications to withdraw groundwater on the basis of hydraulic continuity with Covington Creek, Soos Creek, and the Green River, finding that water was not available, that existing rights including instream flows would be impaired, and that the proposed appropriation would be detrimental to the public welfare. The Board's unchallenged findings of fact establish the following: Black River Quarry originally filed three applications to withdraw a total of 200 gallons per minute from wells within the Soos Creek subbasin of the Green-Duwamish watershed, WRIA 9, but appealed Ecology's denial of only one of the applications, G1-25359 (well no. 3), which requested 100 gallons per minute for irrigation of a golf course. *Black River Quarry, Inc. v. Dep't of Ecology*, PCHB No. 96-56, Board Finding XXII, at 10 (Nov. 15, 1996). The Soos Creek subbasin is roughly the same area as the Covington Upland. *See* Board Finding I, at 3. The property where the golf course is located lies roughly midway between Auburn and Black Diamond, about 2,000 feet southwest of Covington Creek, a tributary to Big Soos Creek and the Green River, and less than two miles north of the Green River. *See* Board Finding XXI, at 9. The Soos Creek subbasin is drained by Soos Creek, with tributaries including Little Soos, Soosette, Covington, and Jenkins Creeks. *See* Board Finding I, at 3.

Base flows have been established for the Green River, and its tributaries are closed to all surface water diversion. Since 1980, the flows have not been met at Auburn an average of 103 days a year, and upstream on the Green

River at Palmer flows have been unmet an average of 100 days per year. The low flows occur mainly between May and November. *See* Board Finding XIV, at 7. Well no. 3 is in hydraulic continuity with regulated surface waters of the Green-Duwamish Watershed, and would capture water which would otherwise discharge to Covington Creek, Big Soos Creek and the Green River. Accordingly, proposed pumping from well no. 3 "would lead to decreased flows in these bodies of water." *See* Board Finding XXV, at 11.

The Green River frequently exceeds class A standards for water quality, pertaining to temperature, dissolved oxygen, fecal coliform and mercury. Late summer temperatures are sometimes a barrier to upstream migration of Chinook salmon, and elevated temperatures may prevent use of the lower Green River by juvenile coho and steelhead. One cause of the elevated temperatures is limited groundwater inflow. *See* Board Finding IX, at 5. The Muckleshoot Indian Tribe operates a hatchery on Crisp Creek, a tributary entering the Green River from the north about one and one-half miles west of the mouth of Newaukum Creek. Both the Muckleshoots and the Department of Fish and Wildlife hold water rights for fish propagation on Crisp Creek. *See* Board Finding XII, at 6. The Department operates a hatchery at mile 0.7 on Big Soos Creek, holding a water right of 35 cubic feet per second, with priority dates of 1965 and 1975. Low flows on the Big Soos have been measured by the United States Geological Survey to be less than 25 cubic feet per second. Streamflow declines have caused the Department to reduce the fish-rearing program. *See* Board Finding XIII, at 6. The seven-day low flow on Soos Creek has declined since 1967, amounting to about 10 cubic feet per second. *See* Board Finding XV, at 7.

The Board applied its legal determination that a finding of hydraulic continuity with unmet minimum flows constitutes an impairment of existing minimum flow rights as a matter of law, here, unmet flows on the Green River, and further concluded that Black River Quarry's proposed withdrawal would impair the senior rights of the Department of

Fish and Wildlife as well. *See* Board Conclusions VII, VIII, X, XIII, at 14, 15, 16. The Board also concluded that hydraulic continuity with Covington Creek, which was closed to further appropriation, would impair existing rights. *See* Board Conclusions II, III, IX, at 13, 15.

Black River Quarry maintains that another golf course in the area which had applied nine months earlier had a water right granted, and that at least four junior applications for consumptive appropriations for groundwater were granted after its application was submitted. Black River's application had been mislaid by Ecology, but was found and acted upon. The Board applied a ruling in an earlier summary judgment order (not the statewide-issues order, but an order regarding summary judgment motions dated September 26, 1996):[12] "[T]he fact that another party's later application in the same basin was approved by Ecology, before Ecology acted on the application of this appellant, cannot be a basis for Ecology or the Board to approve this appellant's application, if it does not other wise [sic] meet the statutory criteria for approval." *See* Board Conclusion V, at 14.

The King County Superior Court affirmed. The court concluded that minimum flows set by rule are appropriations which by law cannot be impaired, that a closure is an "appropriation [for the public welfare] which, by law, cannot be impaired[,]" and that "[a]ny negative effect on the surface water source and/or existing water rights from groundwater pumping is sufficient to form a finding that the proposed groundwater use would 'conflict with, impair, or negatively affect' the surface water source and/or existing water rights." *Black River Quarry, Inc. v. Dep't of Ecology*, No. 96-2-20613-0, at 11-12 (King County Super. Ct. Sept. 14, 1998). The court also held that "[i]f a subsequent applicant within the same watershed obtains a water right permit from Ecology, approval of that permit does not

---

[12] The September 26, 1996, order states that documents submitted by Black River Quarry revealed that two applications filed later than Black River Quarry's were granted.

automatically give all preceding applicants a right to water from that watershed. A water right applicant is entitled to water only when it meets all of the statutory and administrative conditions." *Id.*, at 9.

In addition to the statewide issues discussed earlier, Black River Quarry raises two issues: (1) if Ecology denies an application to appropriate groundwater after granting applications filed later in time for water from the same source, is its action denying the application arbitrary and capricious or contrary to law; (2) did the Board and the superior court err in holding that the proposed withdrawal of groundwater would impair the senior surface water diversionary right of the Department of Fish and Wildlife?

Analysis. Black River Quarry contends that Ecology's action denying its application after granting junior applications is arbitrary and capricious in the absence of any showing that denial was on grounds not shared by the junior applications. Black River Quarry argues that the appropriate remedy for violation of its right to its place in line is that this court should order Ecology to grant its requested permit unless Ecology can show some ground for its denial not shared by the junior applicants.

An applicant's place in line is a right to be protected. *Hillis*, 131 Wn.2d at 392-93; *Schuh v. Dep't of Ecology*, 100 Wn.2d 180, 187, 667 P.2d 64 (1983). Within a given water source area, applications should be considered in the order of application. *Hillis*, 131 Wn.2d at 393. As appellant points out, the Nebraska Supreme Court has held that in determining the availability of water, pending senior applications and the water which might be diverted under them must be considered. *Cent. Platte Natural Res. Dist. v. Wyoming*, 245 Neb. 439, 513 N.W.2d 847, 855 (1994).

Nevertheless, Ecology does not have authority to grant a permit if any of the criteria of RCW 90.03.290 are not satisfied. Here, even if one discounts rights granted to junior applicants allegedly from the same water source, the Board's findings support the conclusion that Black River's application must be denied because its proposed with-

drawal would reduce flows in Covington Creek where water is unavailable because of stream closure, and withdrawal would impair existing minimum flow rights of the Green River.[13]

We hold that regardless of whether junior applications were granted while Black River Quarry's was denied, Black River Quarry's application must satisfy the criteria of RCW 90.03.290. If Ecology granted junior applications for withdrawal from the same source, that action does not render its failure to grant Black River Quarry's application arbitrary and capricious or contrary to law.

Black River Quarry also argues that the Board erroneously held that its proposed withdrawal would impair existing diversionary rights. As noted, the Board's unchallenged findings establish impairment of existing minimum flow rights and that water is unavailable due to stream closures. The effect of Black River Quarry's withdrawal would be to reduce flows which are already inadequate to meet minimum flow requirements, and to reduce flows in streams closed to further appropriation. Because we uphold denial of the application on those grounds, we do not reach the issues regarding impairment of senior diversionary rights, i.e., those of the Department of Fish and Wildlife.

We affirm the superior court's order upholding denial of Black River Quarry's application.

III. *Covington Water District v. Washington State Department of Ecology*

Facts. Many of the Board's findings in this case largely mirror those in Black River Quarry's case, as the same subbasin is involved. Thus, findings as to geology, hydrogeology, hydraulic continuity, water quality, and se-

---

[13] Our conclusion that water is unavailable due to stream closure departs from the analysis of the Board as well as that of the superior court. The Board spoke in terms of hydraulic continuity with a closed stream as impairment of existing rights, a conclusion we reject as explained in this opinion. The superior court termed a stream closure an "appropriation." A stream closure is not an appropriation, but is a determination that there is no further water to appropriate.

nior rights of the Muckleshoots and the Department of Fish and Wildlife were entered as in Black River.

Covington Water District is a special purpose district which provides water to customers within a 55 square-mile area on the Covington Upland. It has the largest service area of any water district in the state, servicing about 11,000 connections and having water available to serve a total of 12,250 residential units. In April 1994, Covington began a moratorium process on further service, and in 1995 it reached system capacity and the moratorium went in effect. *See* Board Finding XXII, at 9-10. Eighty percent of the Covington district is rural, not served by sewers, and twenty percent is urban. *See* Board Finding XXIII, at 10. In April and May 1990, Covington filed three applications to withdraw groundwater at a rate of 3,500 gallons per minute from three wells, the Getty well, and Rouse wells 1 and 2, for continuous domestic consumption. *See* Board Findings XXV, XXVI, XXVIII, at 10-11. Ecology denied the applications on the basis that water was unavailable, and that withdrawal would impair existing rights and be detrimental to the public welfare.

The Getty well is located about two miles west of Black Diamond, and is in hydraulic continuity with Crisp or Covington Creeks. *See* Board Finding XXVIII, at 11. The Board found that the Getty well is in hydraulic continuity with regulated surface waters, and "would induce water from aquifers in hydraulic continuity with regulated surface waters to recharge lower aquifers. This is water that otherwise would discharge to regulated surface waters. Therefore, the proposed pumping *could* lead to decreased flows in Covington or Crisp creeks and the Green River." *See* Board Finding XXIX, at 12 (emphasis added).

The Rouse 1 well is located about 200-300 feet from Jenkins Creek, a tributary to Big Soos Creek and the Green River, and is in hydraulic continuity with regulated surface waters of the Green-Duwamish watershed. *See* Board Findings XXX, XXXII, at 12, 13. The Board found that the well "would induce water from aquifers in hydraulic continuity

with regulated surface waters to recharge lower aquifers. This is water that otherwise would discharge to regulated surface waters. Therefore, the proposed pumping of Rouse well 1 *could* lead to decreased flows in Jenkins Creek, Big Soos Creek and the Green River." *See* Board Finding XXXII, at 13 (emphasis added). Rouse 2 well is 26.5 feet from Rouse 1, and the Board found it was in hydraulic continuity with regulated waters of the Green-Duwamish watershed. *See* Board Findings XXXIII, XXXVII, at 13, 14. The Board found that the well "would induce water from aquifers in hydraulic continuity with regulated surface waters to recharge lower aquifers. This is water that otherwise would discharge to regulated surface waters. Thus, the proposed pumping *could* lead to decreased flows in Jenkins Creek, Big Soos Creek and the Green River." *See* Board Finding XXXVII, at 14 (emphasis added).

The Board also found that Covington ultimately intended to obtain water from the Tacoma Pipeline 5, which would use water surplus to the base flows of the water source. *See* Board Finding XXXVIII, at 15.

The Board applied its legal determination that hydraulic continuity with streams having unmet minimum flows or closed to further appropriation established impairment as a matter of law and upheld denials of the applications. *See* Board Conclusion IX, at 18. The Board also concluded that the proposed withdrawal would impair the senior rights of the Muckleshoots and the Department of Fish and Wildlife. *See* Board Conclusion XIV, at 20.

The King County Superior Court affirmed. While it rejected the principle that continuity alone establishes impairment, it reasoned that there was substantial evidence supporting the Board's findings that Covington's proposed use of groundwater *would* reduce the flows of Crisp Creek, Big Soos Creek, and Jenkins Creek, and would clearly have an adverse impact upon the surface water system contrary to chapter 173-509 WAC. *Covington Water Dist. v. Dep't. of Ecology*, No. 97-2-17946-7 (King County Super. Ct. Sept. 14, 1998).

Analysis. In addition to raising the issues relating to the statewide threshold orders, Covington argues that the Board and the superior court erred in holding that Covington's proposed withdrawal would impair existing senior diversionary rights. First, though, is the question whether the Board's findings establish impairment of minimum flow rights or that water is unavailable due to stream closures.

Under RCW 90.03.290, Ecology must deny an application where a proposed withdrawal of groundwater would impair existing rights, including minimum flows, and must deny an application where water is unavailable. However, the unchallenged findings in Covington do not unequivocally establish that the proposed withdrawal *would* lead to decreased flows in regulated streams. The Board found as to each well that withdrawal *could* lead to reduced flows. These findings, which are unchallenged and verities on appeal, establish the *possibility* of impairment of existing rights through reduction of flows which are already inadequate to meet minimum flow requirements, and the *possibility* that withdrawal might reduce flows where water has already been determined to be unavailable. Given these findings, and the Board's erroneous legal standard, we are unable to conclude with confidence that denial of the applications was proper.

We recognize that some of the other findings seem to indicate, however, that actual impairment of existing minimum flow rights would occur because already inadequate flows would be reduced on the Green River, and that denial is appropriate on the basis that water is unavailable because withdrawal would actually affect the flow of closed streams. The findings state that withdrawal would cause water which otherwise *would* discharge to regulated streams to instead recharge lower aquifers, and then lists in the same findings that flows could therefore be reduced in Crisp, Covington, Jenkins, and Big Soos Creeks and the Green River. These findings are also verities.

In light of the erroneous legal standard which was

applied, and the lack of findings establishing unequivocally that denial was nevertheless proper, we remand this case to the Board for further proceedings.

Covington also argues that the Board erred in finding that its proposed withdrawal would impair the existing surface diversionary rights of the Muckleshoots and the Department of Fish and Wildlife.

Initially, the same problem arises as to impairment of existing diversionary surface water rights holders as arises as to impairment of minimum flow rights and availability of water due to stream closures, i.e., whether the Board's findings establish impairment of senior diversionary rights. Accordingly, remand is appropriate as to this issue as well.

We reverse the superior court, and remand this case to the Board for further proceedings, i.e., application of the legal principle that impairment or unavailability of water must be established—hydraulic continuity alone is not sufficient to satisfy either of these criteria. The Board's findings are inadequate to determine whether denial of Covington's applications was proper.[14]

IV. *Herzl Memorial Park v. Washington State Department of Ecology*

Facts. The Board's unchallenged findings establish: Herzl Memorial Park is a cemetery located in northwest Seattle. *See* Board Finding II, at 2. Herzl is served by City water, but as a result of drought conditions was unable to irrigate its grass in 1993. *See* Board Finding III, at 2. Herzl applied for a permit to withdraw groundwater at 60 gallons per minute during the irrigation season. *See* Board Finding IV, at 3. Ecology granted a preliminary permit to allow Herzl to drill a test well.[15] *Id.* The completed and tested

---

[14] In their assignments of error the Jorgensen appellants assert that the superior court erred in affirming the Board's decision while junior water right applicants competing for the same water as Covington were granted while Covington's was denied. However, unlike the case with Black River Quarry, there is no argument and discussion of the facts respecting Covington in connection with this issue, and we accordingly do not reach it.

[15] *See* RCW 90.03.290 (if the application does not contain and the applicant does

well is in an aquifer which discharges in part into Boeing Creek and in part into Puget Sound and is thus in hydraulic continuity with Boeing Creek. *See* Board Finding VI, at 3. Ecology denied the application, finding the proposed withdrawal was from water in hydraulic continuity with Boeing Creek, and that water was not available, that existing rights would be impaired, and the requested appropriation would be detrimental to the public welfare.

"Boeing Creek" has come to be the accepted name of a small perennial stream in northwest King County, in the Cedar Sammamish watershed, WRIA 8. *See* Board Findings I, IX, at 2, 4. The creek has had several names including Hidden Creek and Hidden Lake Creek. *See* Board Finding IX, at 4. One version of the Department of Natural Resources maps of the area refers to it as "Hidden Lake Creek." Dominant senior rights on the stream refer to it as an "unnamed stream." Ecology's rule closing the stream calls it "unnamed stream (11-26-3E)." *Id.* The Board expressly found that although there are three other streams existing in section 11-26-3E, they are all too small or steep to be fish-bearing and thus would not have been relevant to Ecology in drafting its rule. Boeing Creek is the "unnamed stream" listed in the rule closing the stream. *See* Board Finding IX, at 4.

Anadromous fish numbers in the creek have declined due to the impact of water quality degradation, low summer flows, and a mostly impassable diversionary dam used by the Seattle Golf and Country Club. Further loss of base flows will further damage the fishery and will interfere with current efforts to restore anadromous fish runs. *See* Board Finding XI, at 5.

Herzl challenges one finding of the Board. In this challenged finding, the Board found that existing senior rights, particularly that of the Seattle Golf and Country Club, are

---

not provide sufficient information for a decision on an application, Ecology may issue a preliminary permit requiring the applicant to "make such surveys, investigations, studies, and progress reports, as in the opinion of" Ecology may be necessary).

often not satisfied by summer flows in the creek. Thus, any further withdrawal from the creek's groundwater base flows would impair senior rights. *See* Board Finding X, at 5.

The Board applied its legal determination that hydraulic continuity establishes impairment, and upheld denial of the application. Herzl appealed to King County Superior Court, which affirmed. Herzl argued among other things that Ecology's rule closing Boeing Creek violated the fair notice doctrine and was void for vagueness because it listed an unnamed stream, did not explain the numbers representing the designated section, township and range, and in fact there are four streams ending within that designation. The court held that "[t]he fair notice doctrine is not applicable to the facts of the present case." *Herzl Mem'l Park v. Dep't of Ecology*, No. 97-2-17932-7, slip op. at 8 (King County Super. Ct. Sept. 14, 1998). The court rejected the Board's conclusion that hydraulic continuity alone establishes impairment, but nevertheless found that substantial evidence supports the Board's findings, which the court determined establish that the Seattle Golf and County Club's senior rights would be impaired, that fish habitat would be impaired, and that Boeing Creek is closed to further depletion. *Id.* at 4.

Analysis. With regard to the Board's determination that the proposed withdrawal would be from an aquifer in hydraulic continuity with a stream closed to further appropriations, the Board did not find that withdrawal from Herzl's well would reduce the flow in Boeing Creek. Accordingly, because the Board applied the incorrect legal standard and its findings do not establish that denial was nevertheless proper, we remand to the Board.

As to impairment of existing rights, Herzl has challenged the Board's finding that existing senior rights, particularly that of the Seattle Golf and Country Club, are often not satisfied by summer flows in the creek and that any further withdrawal from the creek's groundwater base flows would impair senior rights. Herzl argues that the evidence establishes that any effect from the proposed withdrawal would

not be measurable in Boeing Creek, and accordingly no impairment of senior surface water diversionary rights would occur.

 Instream measurements using standard stream measuring devices are not required to establish impact or impairment. We reject the argument that there must be a measurable impact at the point of the Seattle Golf and County Club diversion in order to find an impairment of the club's water right. Nevertheless, the findings do not establish whether denial of Herzl's application on the basis of impairment of existing diversionary rights was proper.

Herzl next argues that the rule closing Boeing Creek is not understandable by persons of common intelligence because it refers to an unnamed creek, does not explain the section designation in the rule, and there are in fact three other streams within the section designation. (While Herzl points to evidence that the rule confused everyone, though, Ecology points to other evidence to the contrary.) Herzl contends the rule violates constitutional due process principles because it fails to provide fair notice and is void for vagueness.

"An ordinance is unconstitutional when it forbids conduct in terms so vague that persons of common intelligence must guess at its meaning and differ as to its application." *Burien Bark Supply v. King County*, 106 Wn.2d 868, 871, 725 P.2d 994 (1986). "Such an ordinance violates the essential element of due process of law—fair warning." *Id.* The doctrine serves two important goals—providing fair notice as to what conduct is proscribed, and protection against arbitrary enforcement of the laws. *City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988).

 However, unless a statute (or regulation) affects conduct, it is not subject to attack as vague. *Jones v. City of Lubbock*, 727 F.2d 364, 373 (5th Cir. 1984). Here, the rule closing Boeing Creek does not affect conduct by proscribing or requiring an applicant's doing of any act. An applicant seeking a water permit must still satisfy the four criteria in RCW 90.03.290. Thus, the superior court correctly reasoned

that the fair notice doctrine does not apply in the context of determining whether an applicant has satisfied the criteria of RCW 90.03.290.[16]

We reverse the superior court and remand this case to the Board for further proceedings, i.e., application of the legal principle that impairment or unavailability of water must be established—hydraulic continuity alone is not sufficient to satisfy either of these criteria. The Board's findings are inadequate to determine whether denial of Herzl's application was proper.

V. *Postema v. Pollution Control Hearings Board*

Facts. On November 17, 1992, John Postema filed three applications for withdrawal of groundwater, each requesting withdrawal of 100 gallons per minute for a residence and irrigation of 10 acres. In April 1993, Ecology issued three preliminary permits authorizing Postema to drill and test the wells. These preliminary permits were issued pursuant to RCW 90.03.290, which provides that if the application does not contain, and the applicant does not provide, sufficient information for a decision on an application, Ecology may issue a preliminary permit requiring the applicant to "make such surveys, investigations, studies, and progress reports" as may be necessary. The preliminary

---

[16] Herzl complains that Ecology did not immediately deny its application on the basis that Boeing Creek was closed, as Herzl says Ecology would have done had it known the stream was Boeing Creek. The difficulty with this claim is, however, that it presupposes that there would be an impact from the well on Boeing Creek. Further, to the extent that Herzl's argument rests on the idea that it would not have invested in a test well if it had known that Boeing stream was closed and thus was harmed by lack of clarity in the rule, the argument does not withstand examination. The information provided by Herzl was obviously inadequate for Ecology to act on Herzl's application. Ecology therefore required Herzl to dig a test well to provide sufficient information for a decision on the application. RCW 90.03.290 plainly authorizes Ecology to require an applicant to obtain and submit additional information in order to determine whether to grant a permit. Until the information was sufficient to make the determination, it was questionable whether Herzl's withdrawal of groundwater would have any relationship to Boeing Creek. Moreover, the preliminary permit granted states that "[a]ll expenses, risks, and liabilities incurred during well testing shall be borne by the applicant" and says that "[t]he granting of this PRELIMINARY PERMIT shall not be construed, by inference or otherwise, that subject application will ultimately be approved." Decl. of Douglas C. Dow in Support of Herzl Mem'l Park's Mot. for Summ. J., ex. B., app. 1 (Mar. 28, 1994).

permits expired October 1, 1993, without Postema having gathered information on the wells. New preliminary permits were then issued with an expiration date of October 31, 1994. No pump data or hydrogeologic testing had been submitted by Postema by January 8, 1996, when Ecology denied the applications on the basis that water was not available for appropriation, and that the proposed withdrawal would impair existing water rights and would be detrimental to the public welfare. Ecology's determination was based upon chapter 173-507 WAC and Ecology's conclusion that the proposed wells would draw from groundwater in hydraulic continuity with Evans Creek, a tributary to the Snohomish River. Minimum flows have been set for the Snohomish River at several points along the river. WAC 173-507-020.

Postema appealed. Prior to the evidentiary hearing on his appeal, Postema moved for summary judgment, contending that none of the minimum flows set for the Snohomish were applicable to the proposed wells, because the wells were in an area where the river is subject to tidal influence. WAC 173-507-020(1) provides that the first section of the Snohomish River subject to a minimum flow requirement as one moves up the Snohomish River from its mouth is defined as "[f]rom influence of mean annual high tide at low base flow levels to confluence with Skykomish River and Snoqualmie River, excluding Pilchuck River."

The Board denied the motion and set the matter for a full hearing. At the hearing, Postema presented his evidence, at the close of which Ecology moved for judgment as a matter of law under CR 50(a). Ecology's motion was premised on its conclusion that the evidence presented showed that Postema's wells would withdraw water in hydraulic continuity with Bear Creek, a closed stream. The Board granted Ecology judgment as a matter of law.

The Board found that Postema's wells are located near a groundwater divide between Bear Creek, located in the Cedar-Sammamish watershed (WRIA 8), and Evans Creek, in the Snohomish watershed (WRIA 7). *Postema v. Pollution*

*Control Hr'gs Bd.*, Nos. 96-08, 96-11, 96-20, 96-22, 96-25, 96-27, 96-28, 96-29, 96-48, 96-53, 96-55, 96-57, 96-58, 96-65, 96-66, 96-82, 96-88, 96-101, 96-107, 96-108, 96-109, 96-110, 96-116, 96-117, 96-118, 96-122, 96-150, 96-153, and 96-170 (Snohomish County Super. Ct. Jan. 7, 1997). The Board also found that the proposed withdrawals are from groundwater in hydraulic continuity with Bear Creek, a closed stream, and "[p]umping the subject wells will alter groundwater flows and capture groundwater that *could* discharge as baseflow to Bear Creek." *See* Board Findings 1, 3, 4 at 3 (emphasis added). The Board applied its determination that hydraulic continuity constitutes impairment as a matter of law, and held that the proposed withdrawal would impair senior rights, the closed flows of Bear Creek. *See* Board Conclusions 1, 2 at 3-4.

Postema appealed to the Snohomish County Superior Court. He challenged the Board's order on the statewide threshold issues and raised challenges under the APA specific to his particular case. He also alleged that Ecology and the Board violated his right to equal protection under the state and federal constitutions because Ecology earlier had granted another applicant's application allegedly from the same water source; that his due process rights were violated; that his civil rights were violated in contravention of 42 U.S.C. § 1983; and that the rules setting instream flows and closing streams like Bear Creek are not valid.

As explained in the discussion on the statewide issues, like the King County Superior Court, the Snohomish County Superior Court generally affirmed the Board's rulings on the statewide threshold issues, but held that continuity alone is not enough to establish impairment as a matter of law. Instead, impairment must be established factually, with the applicant having the opportunity to challenge Ecology's factual determination of impairment.

The court observed that the directed verdict rule, CR 50(a), does not apply because there was no jury. The court treated Ecology's motion at the close of Postema's case before the Board as a motion to dismiss at the end of

plaintiff's case, CR 41(b)(3), and said that because there was no evaluation or weighing of the evidence, the same standard of review applied as in the case of a summary judgment order.

With regard to the Board's denial of Postema's motion for summary judgment, the court held that there were material issues of fact remaining as to whether Postema's proposed withdrawal would impair minimum flow requirements of the Snohomish River, and more specifically whether the Snohomish River is subject to tidal influence at the point Evans Creek flows into the Snohomish River.

As to the Board's order affirming denial of Postema's applications, the court held that the factual circumstances of the proposed wells are different, because well no. 3 is not located near the divide between Evans and Bear Creeks, and its geologic setting is different from the other two wells. Thus, there are factual issues as to whether the withdrawals would all have the same impact. The court accordingly remanded to the Board for further proceedings. The court noted that remand was also appropriate in light of its legal determination that hydraulic continuity is not enough to establish impairment as a matter of law.

After issuing its decision on Postema's APA appeal, in a separate order dated November 30, 1998, the court granted Ecology's motion to dismiss, without prejudice, Postema's equal protection, due process and § 1983 claims, and, incidental to this motion, granted a motion to strike discovery requests. The court also dismissed Postema's challenges to the validity of the minimum flow and closure rules.

Analysis. In addition to the issues raised in connection with the orders on the statewide threshold issues, Postema raises several issues concerning his particular case. First, though, Ecology and respondent-intervenor the Tulalip Tribes of Washington maintain that Postema is not entitled to appeal the denial of his motion for summary judgment before the Board because no final order has been issued in this case.

Postema moved for summary judgment before the Board,

which was denied. Following an evidentiary hearing and a decision in his case, he appealed both the decision on the statewide orders and the decision in his individual case to superior court. That court ruled against him on most of the statewide issues, but remanded on the ground that there were factual issues remaining as to impairment of minimum flows on the Snohomish River and as to whether the wells would all have the same impact (if any). RCW 34.05-.526 provides that "[a]n aggrieved party may secure appellate review of any final judgment of the superior court under this chapter [the APA] by the supreme court or the court of appeals." Because Postema is aggrieved by the final judgment of the superior court, which ruled among other things that he was not entitled to summary judgment, his appeal is proper.

Next, we turn to the propriety of the Board's ruling on Postema's summary judgment motion. When reviewing denial of summary judgment, this court makes the same inquiry as the Board, i.e., summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999); CR 56(c). Facts and reasonable inferences from the facts are considered in the light most favorable to the nonmoving party. *Hertog*, 138 Wn.2d at 275.

Postema contends that there is no material issue of fact as to whether tidal influence affects the Snohomish at the confluence of Evans Creek and the Snohomish, and that Ecology and the Tulalip Tribes have not raised any reasonable question of fact.

However, Ecology and the Tribes did submit experts' declarations that there was no tidal influence, contrary to Postema's expert's declarations that there was. While Postema submitted an additional declaration maintaining that Ecology's expert had misinterpreted data, the superior court correctly concluded that a court does not resolve disputed issues of fact in the context of a summary judgment. The superior court therefore correctly held that the

Board properly denied Postema's motion for summary judgment on the issue whether minimum flow requirements exist at the confluence of Evans Creek and the Snohomish River.

Postema contends that Ecology is prohibited from arguing that its denial of his applications should be upheld due to the effect of withdrawal on Bear Creek rather than (or in addition to) the effect of withdrawal on minimum flows of the Snohomish. Ecology originally denied Postema's applications on the basis that his proposed wells would withdraw groundwater in hydraulic continuity with Evans Creek, tributary to the Snohomish River, and therefore the withdrawal would impair minimum flow rights on the river. At the evidentiary hearing, following Postema's presentation of evidence, Ecology moved for a directed verdict (as noted, CR 41(b)(3) is the appropriate rule), contending that the evidence established that withdrawal would be from waters in hydraulic continuity with Bear Creek, a closed stream. Postema argues that Ecology is prohibited from modifying its decision once it is final.

Initially, the superior court was incorrect in applying a summary judgment standard of review to the Board's final order. CR 41(b)(3) authorizes a court to render a judgment on the merits against the plaintiff and enter findings as provided in CR 52(a). Here, the Board entered findings, indicating that it weighed the evidence. *See Nelson Constr. Co. of Ferndale, Inc. v. Port of Bremerton*, 20 Wn. App. 321, 582 P.2d 511 (1978). Nevertheless, the court's ultimate decision is correct.

The Court of Appeals has held that generally an agency does not have authority to reopen and reconsider a final decision in the absence of a specific statute, charter, or ordinance authorizing it, though an exception exists where, through fraud, mistake, or misconception of facts an order is entered which is promptly recognized to be in error. *Hall v. City of Seattle*, 24 Wn. App. 357, 362, 602 P.2d 366 (1979); *see Wiles v. Dep't of Labor & Indus.*, 34 Wn.2d 714, 719-20, 209 P.2d 462 (1949) (agency order can be withdrawn pro-

vided action occurs before the time for appealing from the order has expired). In *St. Joseph Hospital & Health Care Center v. Department of Health*, 125 Wn.2d 733, 887 P.2d 891 (1995), we said that once an agency has made a decision, that decision normally may be changed only through the appellate process; otherwise, res judicata principles would be violated. *Id.* at 744. When the appellate process results in remand to an agency, the agency must begin again and must provide the same procedural safeguards required in the original action. *Id.*

However, unlike other administrative agencies, Ecology has no adjudicative authority, because the Legislature passed that authority to the Pollution Control Hearings Board. RCW 43.21B.240, .010, .110, .230. The Board hears matters de novo, WAC 371-08-485, allowing Ecology and all other parties to present all relevant information for the Board to make a decision. Here, Postema had the opportunity to present his own evidence. The evidence presented at the hearing led to the change in Ecology's position. Ecology was not foreclosed from arguing a changed position based upon the evidence presented, and the Board was authorized to reach a decision based upon that evidence.[17]

Moreover, because this case is remanded, the parties will again have the opportunity to present evidence on remand with the usual procedural safeguards at the hearing before the Board. On remand, Ecology may rely on hydraulic continuity with Bear Creek in arguing that the proposed withdrawals will affect a closed stream, assuming that Ecology's evidence supports the argument and Ecology chooses to assert that position.

In its November 30, 1998, order the superior court dismissed without prejudice Postema's claims that his rights to equal protection and due process have been violated, as well as his § 1983 claim premised on such

---

[17] We also note that Postema failed to provide requested hydraulic information pursuant to his preliminary permit at a time when Ecology could have used the information in its decision.

violations. The court also held that certain of his due process challenges were barred by the two-year time limit for procedural challenges to rules under the 1979 APA (the act applicable when the challenged rules were adopted).

Postema's petition for judicial review and complaint alleges that his application for a right to withdraw groundwater was denied because his proposal would withdraw groundwater which could flow to Bear Creek, which is closed to further withdrawals; that Ecology previously granted a right to the Cross Valley Water Association or District to withdraw groundwater from an aquifer which flowed to Bear Creek even though the basin was closed; and that Ecology has given no legitimate reason for its preferential treatment of Cross Valley and discriminatory treatment against plaintiff; and no legitimate reason exists. Clerk's Papers at 579. He sought a declaration that his rights to equal treatment have been violated and an injunction prohibiting the continuation of such discrimination. *Id.* Ecology moved to dismiss this claim on the ground that Postema failed to state a claim upon which relief can be granted for failure to allege specific factual and legal elements of such a claim. The court agreed, additionally noting that Postema had not moved to amend his pleadings, and a decision on his applications is still pending administratively.

CR 12(b)(6) and CR 8(a)(1) together provide that the complaint shall contain a short and plain statement of the claim showing the pleader is entitled to relief. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032 (1987) (citing *Bowman v. John Doe Two*, 104 Wn.2d 181, 183, 704 P.2d 140 (1985)), *appeal dismissed*, 488 U.S. 805 (1988). A motion to dismiss pursuant to CR 12(b)(6) for failure to state a claim upon which relief could be granted should be granted only if the plaintiff cannot prove any set of facts which would justify recovery. *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998). Plaintiff's allegations are presumed true and a court may consider hypothetical facts not included in the record.

*Id.* at 330. Under this standard, the equal protection claim is sufficiently stated. *See Vill. of Willowbrook v. Olech,* 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000).

However, as the superior court noted, a decision on Postema's application is still pending administratively. Because the final decision on Postema's application remains to be made, the superior court's conclusion that the equal protection claim is premature is correct.

Turning now to the superior court's dismissal of Postema's due process claims, none of Postema's briefing before this court identifies or discusses any constitutional due process claims (with the possible exception of rule challenges discussed below). Postema thus has not raised, or at the least not sufficiently raised, any issue regarding dismissal of any due process claims and we accordingly do not reach the propriety of the superior court's dismissal of such claims.

Because the equal protection claim is premature, the § 1983 claim was also properly dismissed by the superior court as premature.

The superior court also dismissed Postema's challenges to minimum flow and stream closure rules. The nature of Postema's challenges is not at all apparent from Postema's opening brief. He simply asserts his challenges are substantive, not procedural. In his reply brief, he indicates he challenges the rules for noncompliance with chapters 90.54, 43.21C and 90.22 RCW. He says that the rules were not supported by the evidence at the time they were adopted and relies upon *Neah Bay Chamber of Commerce v. Department of Fisheries,* 119 Wn.2d 464, 832 P.2d 1310 (1992), for the proposition that an agency must have evidence to support a rule adopted years before RCW 34.05.370(1) specifically required a rule-making file.

Postema does not cite any particular statutes, and his general references to entire chapters of two titles of the code and *Neah Bay* are insufficient to apprise the court of the nature of his challenges, and constitute insufficient

argument. Further, to the extent his argument seems to be that a formal rule-making file should exist, the contention is inconsistent with the version of the APA which applied at the time the rules were adopted. *See Neah Bay*, 119 Wn.2d at 474 (validity of agency action to be determined as of the time it was taken); *St Joseph Hosp. & Health Care Ctr. v. Dep't of Health*, 125 Wn.2d 733, 744-45, 887 P.2d 891 (1995) (same). To the extent he argues that the expanded review process under the new APA outlined in *Neah Bay* applies, he overlooks an important aspect of that decision. The court expressly observed that the challenged regulations classifying coastal areas and governing fishing seasons are revised regularly and change constantly. *Neah Bay*, 119 Wn.2d at 468 n.2. The court said that "[b]ecause the only significant regulations before us are those currently in effect, the new APA applies." *Id.* at 468. Thus, the court in *Neah Bay*, contrary to Postema's apparent claim, did not apply either the new APA or the court's analysis under the new APA to regulations predating the new APA.

Finally, although it does not appear from the briefing filed in this court that Postema asserts that any challenge to the minimum flow and closure rules is a constitutional due process challenge, to the extent he intends such a challenge it is inadequately presented.

Postema has failed in his briefing before this court to identify any substantive challenges under the old APA not subject to the two-year bar for procedural challenges.

We affirm the November 30, 1998, order.

Postema seeks attorney fees on appeal. Postema wants the court to rule that if he ultimately prevails in his claim for declaratory relief on the constitutional issues, he should receive attorney fees pursuant to 42 U.S.C. § 1988. Postema's request for attorney fees under § 1988 is premature.

As to attorney fees pursuant to RCW 90.14.190 for this appeal, the statute authorizes an award of attorney fees to an appellant if it finds that the appellant was injured

by an arbitrary, capricious, or erroneous decision of Ecology. However, where there has been no order or decision having any actual impact on any water rights, attorney fees are not awardable under RCW 90.14.190. *Okanogan Wilderness League, Inc. v. Town of Twisp*, 133 Wn.2d 769, 786, 947 P.2d 732 (1997); *see Rettkowski v. Dep't of Ecology*, 128 Wn.2d 508, 518, 910 P.2d 462 (1996) (appellant irrigators legally protected water rights invaded by Ecology's unconstitutional and illegal orders forcing them to stop irrigating for 10 days; attorney fees awarded). Postema has no water rights at issue. This case concerns his applications for permits to withdraw water. Accordingly, attorney fees are not awardable under RCW 90.14.190 regardless of Ecology's decision.

In his reply brief, Postema moves to strike all material in the brief of respondent Tulalip Tribes which concerns evidentiary material not considered by the Board (because the Board dismissed at the close of Postema's case and did not hear evidence from the respondents). "A party may include in a brief only a motion which, if granted, would preclude hearing the case on the merits." RAP 17.4(d). Postema's motion, if granted, would not preclude hearing this case on the merits, and therefore we will not consider the motion.

## CONCLUSION

We affirm the King County Superior Court order on the statewide threshold issues. We also affirm the King County Superior Court decisions in *Jorgensen v. Department of Ecology* and *Black River Quarry, Inc. v. Department of Ecology*. We reverse the King County Superior Court's orders in *Covington Water District v. Department of Ecology* and *Herzl Memorial Park v. Department of Ecology*, and remand these cases to the Board.

We affirm the Snohomish County Superior Court's decision in *Postema v. Department of Ecology*, and affirm its November 30, 1998, order. We remand this case to the Board.

Guy, C.J., and Smith, Johnson, Alexander, Talmadge, Ireland, and Bridge, JJ., concur.

Sanders, J. (dissenting) — Still waters run deep; deeper, I think, than the majority cares to measure with the analytical tools at its disposal.

On the surface the majority's analysis seems to make sense: when there is no more surface water available because of preexisting rights or designated minimum flows, groundwater withdrawal permits must be denied if they adversely "impact" preexisting rights. So far so good; however the majority superficially assumes any diminution of surface water, however slight or even de minimis, constitutes an adverse "impact" if it is "measurable." By "measurable," however, the majority does not mean quantifiable but rather "qualifiable," i.e., a mere determination that there is some, perhaps to an unknown degree, diminution in surface flow.

Thus, according to the majority, a well water permit should be denied when we can say with scientific certainty that as little as a thimbleful, or even a molecule, of water would be diverted from the surface flow.

There are at least two fundamental faults buried deeply beneath the surface of this thinking: (1) the statute doesn't say that and (2) we cannot rationally *apply* a standard with greater precision than the standard itself.

I also question dismissal of Postema's due process and equal protection claims on the ground they are "premature." Such claims "mature" when a final action takes place, there being no requirement in the law that any person so deprived must exhaust a judicial appeal as a condition precedent to seeking relief under 42 U.S.C. § 1983.

*I. Meaning of "impairment"*

RCW 90.03.290 provides as condition precedent to grant-

ing a permit to appropriate surface water "the application will not *impair* existing rights . . . ." (Emphasis added.) The statute also provides, "But where there is no unappropriated water in the proposed source of supply, or where the proposed use conflicts with existing rights, or threatens to prove detrimental to the public interest, *having due regard to the highest feasible development of the use of the waters* belonging to the public, it shall be the duty of the department to reject such application . . . ." RCW 90.03.290 (emphasis added). RCW 90.44.060 makes the surface water appropriation statute applicable to withdrawals of groundwater.

Therefore we must first determine under what circumstances a withdrawal of groundwater "impairs" preexisting surface water rights, particularly previous minimum flow determinations published by the Department of Ecology, in order to determine when a withdrawal permit should be granted or denied. The majority does not consider this question, only assumes its answer.

The majority purports to facially disagree with the position taken by the Department of Ecology that mere hydraulic continuity between the groundwater and the contiguous surface water is sufficient unto itself to establish the requisite impairment; however it rejects Postema's claim that surface water flow be necessarily measurable, in a quantifiable sense, by flow measuring devices which are accurate only within five percent.

Unlike the majority, I would look to the statute to determine what the Department of Ecology must demonstrate to prove an "impairment" of existing water rights so as to justify denial of the permit application. Recall the majority indicates even a de minimis[18] effect on surface waters is sufficient to establish "impairment."

[W]e hold that a proposed withdrawal of groundwater from a

---

[18] *Barron's Law Dictionary* defines "de minimis" as: "insignificant; minute, frivolous. Something or some act which is 'de minimis' in interest is one which does not rise to a level of sufficient importance to be dealt with judicially." BARRON'S LAW DICTIONARY 128 (3d ed. 1991).

closed stream or lake in hydraulic continuity must be denied if it is established factually that the withdrawal will have *any* effect on the flow or level of the surface water.

Majority at 95 (emphasis added); *see also* Majority at 92. Aside from the fact RCW 90.03.290 does not say "any," the real question is what does the term "impairment" mean. The majority assumes that *any* diversion of surface water, no matter how slight, is an "impairment" as long as it can be measured. As such, the majority adopts the thrust of the "qualitative" hydraulic continuity argument proffered by the Department of Ecology, which is satisfied by the mere interaction between ground and surface water resulting in the slightest diminution of the quantity of surface water through pumping of groundwater. In essence, the rule proffered by the majority allows the Department of Ecology to deny a groundwater permit if Ecology proves only a single molecule of surface water was lost to the stream— assuming such a molecule is "ascertainable," although perhaps not quantifiable, using the best available science. *See* Majority at 91-92.

The majority admits the statutes at issue here—RCW 90.03.290 and 90.44.050—do not define the term "impairment." Majority at 90. Words that are not statutorily defined must be given their ordinary and usual meaning. *Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976). We may also look to a dictionary for the definition. *State v. Pacheco*, 125 Wn.2d 150, 154, 882 P.2d 183 (1994). *Black's Law Dictionary* defines "impair" as "[t]o weaken, to make worse, to lessen in power, diminish, or relax, or *otherwise affect in an injurious manner*." BLACK'S LAW DICTIONARY 752 (6th ed. 1990) (emphasis added). Were we to accept this definition, we must then ask: "affect what?"

The answer to this question may be found in the general statement of public purpose upon which the whole statute is based:

Perennial rivers and streams of the state shall be retained

with base flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values .... Withdrawals of water which would conflict therewith shall be authorized only in those situations where it is clear that overriding considerations of the public interest will be served.

RCW 90.54.020(3)(a). Reading "impair" in the statutory context, with due regard for the public policy to be advanced, we must conclude withdrawals of water which do *not* conflict with the preservation of one or more of the identified interests do not "impair" existing water rights or base flows. Thus to justify denial of the permit, the Department of Ecology should be required to demonstrate, for example, that there would be fewer fish as a result of the withdrawal, or that navigable waters would be rendered unnavigable because of the withdrawal, or that the watercourse would be less "aesthetically" pleasing because it would be perceptively different before and after the groundwater withdrawal to the eye of the observer. Conversely, withdrawal of an actual, measurable amount—such as a thimbleful—which would have no demonstrable adverse effect (i.e., injurious effect on wildlife, fish, etc.), would not "impair" preexisting rights, and thus is no justification to deny the permit.

This approach is consistent with other provisions of the Water Code which require the Department of Ecology to have "due regard to the highest feasible development of the use of the waters belonging to the public . . . ," RCW 90.03.290, as well as a number of the interests stated in RCW 90.54.020(2), which include "maximum net benefits for the people of the state," and maintenance of base flows "necessary to provide for preservation of wildlife, fish, scenic, aesthetic and other environmental values, and navigational values." RCW 90.54.020(3)(a).

The majority compounds its erroneous interpretation of the statutory term "impair" when it allows the Department of Ecology to deny a groundwater withdrawal permit based upon the mere qualitative demonstration that it will have

*some* effect, however slight, on surface waters which have been fully appropriated or are functioning at minimum flow. *See* Majority at 93 ("However, where minimum flows would be impaired, then an application must be denied.").

The error with this approach is not only the failure to accord "impair" its statutory meaning but also the factual prospect (perhaps a subject for remand) that standard measuring equipment with a five percent tolerance was used by the Department of Ecology to determine minimum flows and preexisting rights in the first instance. In that event deviations of actual flow within the tolerance of stream measuring equipment will not defeat preexisting rights or minimum flows designated by Ecology through use of standard measuring equipment to five percent accuracy.

Instream flow regulations, and other rules which limit surface water withdrawals in the Snohomish River basin, are published in the Washington Administrative Code (WAC) chapter 173-507. These rules establish instream flows for 10 locations within the Snohomish River basin and authorize control stations to measure such flows and regulate compliance. *See* WAC 173-507-020(1) ("Instream flows are established for stream management units *with monitoring to take place at certain control stations as follows . . . .*") (emphasis added). The control station number for each of the instream flow control points is intended to correspond to a United States Geological Survey stream gauge number for the same location. Ex. A-18 (*Draft Initial Watershed Assessment Water Resources Inventory Area 7 Snohomish River Watershed* 22 (Mar. 17, 1995)). A witness for the Department of Ecology, Mr. Linton Wildrick, acknowledged the limitations of standard measuring equipment which are used to set these minimum flows and monitor compliance:

> Measurement of streamflow reduction caused by ground water withdrawals is very difficult and rarely attempted. In most cases, a successful test requires a well to be very close to the stream and to be pumped at a high rate for an extended period. This situation rarely occurs. *Unless the well captures approximately five percent (5%) of the stream flow, the effect*

*cannot be accurately detected with standard measuring equipment.* Five percent of the flow of many streams exceeds the pumping rates of all but the largest wells. Consequently, such tests are rarely practical. For this reason, hydrologists usually *estimate* hydraulic properties based on standard aquifer testing and then calculate or *model* stream flow effects based on those properties.

Administrative R. at 236 (emphasis added) (Resp't Ecology's Br. in Resp. to Mot. for Summ. J. re Statewide Issues, App. 2 (Decl. of Linton Wildrick, Pollution Control Hearings Board)).

Because the accuracy of standard measuring equipment is limited to within five percent, hydrologists "measure" smaller effects of groundwater withdrawal upon the flow of a particular stream by estimates and theoretical modeling. While this approach may be the "standard professional practice," *Id*. at 237, it nevertheless is intended to guesstimate the withdrawal or diversion of such a small amount of water is within the tolerance of existing minimum flows and preexisting rights which the department is charged to protect.

Despite the obvious scientific approximation which yields a minimum flow determination, the majority attributes a precision to the determination beyond its nature, much like searching for Martian Canals with a pair of binoculars: "We also reject Postema's argument that a significant *measurable* effect on stream flows is required . . . . The statutes do not authorize a de minimis impairment of an existing right." Majority at 92 (emphasis added). The scope of the existing water right—minimum flows—is not calculated to the centiliter but rather at best to the limits of measuring devices actually used to quantify stream flow. By disallowing even an *immeasurable* effect on minimum flows, the majority approach injects irrationality into the equation, requiring greater specificity than the standard itself.[19]

---

[19] Arguably the accumulation of such de minimis diversions might at some point reach a level measurable in the stream using the same equipment used to set the standard in the first place; however that is the cumulative impact issue not

Further, by allowing the Department of Ecology to deny a proposed groundwater withdrawal because of an immeasurable effect on stream flows, the majority disregards the statutory prerequisite to establish impairment and ignores its own interpretation of this term of art. *See*, e.g., Majority at 91 (Impact or effect of impairment must be ascertainable using the best available science.). If a particular groundwater withdrawal has an *immeasurable* effect on stream flows, it cannot be said that such impact is "ascertainable"—even using the best available science.

In summary, the majority defines "impairment" as any effect, no matter how insignificant, on the quantity of surface water, even though there will be no real life effect on any of the interests which the Water Code is designed to protect. However, a proper construction of the statute requires a proposed withdrawal of groundwater from a closed stream or lake in hydraulic continuity be denied only if it is established factually the withdrawal will have an appreciable and material adverse effect on the minimum flows necessary to provide for preservation of wildlife, fish, scenic, aesthetic, other environmental values, or navigation.

Under such a formulation, it might be necessary to remand some of the cases to the Pollution Control Hearings Board to determine if the facts meet the statutory "impairment" standard. Of course, nothing forecloses Ecology from presenting analysis or new evidence of impact on the minimum flows necessary to meet the impairment standard at the time of the hearing upon remand. However, I posit a simple factual determination that groundwater withdrawals would lower the groundwater table, without also quantifying the effects on the surface water in terms of the interests the Water Code protects, is insufficient to comply with the statute.

addressed by the majority. *See* Majority at 89. But since our system is based on priorities it would seem, as Postema argues, projected cumulative impacts from other hypothetical future users would not serve as a lawful statutory basis to deny a permit to a current applicant whose application, if granted, would not violate the standard.

## II. Postema's constitutional claims

I also question affirming the superior court's dismissal of Postema's equal protection and due process claims simply because his well water application "is still pending administratively" as a result of a judicial remand. Majority at 123. In point of fact Postema already received a final administrative determination which he challenged on judicial review, which review has now resulted in a remand for further proceedings.

Like substantive due process claims, equal protection claims are actionable when the wrongful action is taken. *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 964-65, 954 P.2d 250 (1998); *see also Rutherford v. City of Berkeley*, 780 F.2d 1444, 1447 (9th Cir. 1986) (substantive due process violated at moment harm occurs); *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 21 n.11, 829 P.2d 765 (1992) ("[A]n action for a violation of substantive due process is ripe immediately . . . because the harm occurs at the time of the violation."); *Cox v. City of Lynnwood*, 72 Wn. App. 1, 8, 863 P.2d 578 (1993) (substantive due process is violated at the moment harm occurs). Accordingly, what we are looking for is a final decision by the administrative decision maker, not exhaustion of administrative remedies or appeals. *See Sintra, Inc.*, 119 Wn.2d at 32 (Utter, J. concurring) ("[F]inality would not have required appeals, for example, to the Board of Zoning Appeals." (citing *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985))). Here, Postema obtained a final and adverse decision from the administrative decision maker. At that point his cause of action accrued for violation of his civil rights—whether or not he chose to appeal. The fact that he did appeal, and obtained a remand to the Board, does not remedy the earlier violation of his civil rights, if there was one. Not surprisingly, the majority fails to cite any authority to contradict the well-settled principle that such civil rights claims are ripe at the time the wrongful action is taken.

In the context of this case the error may seem less than significant; however it is an ill-considered precedent which will play havoc with that great body of law essential to protect and remedy civil liberty deprivations.

Again without citation to authority, the majority summarily concludes "[b]ecause the equal protection claim is premature, the § 1983 claim was also properly dismissed by the superior court as premature." Majority at 123. But Supreme Court precedent clearly holds exhaustion of state administrative remedies is not required before a litigant may have a cause of action pursuant to 42 U.S.C. § 1983. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990) ("[T]he constitutional violation actionable under § 1983 is complete when the wrongful action is taken."); *see also Monroe v. Pape*, 365 U.S. 167, 183, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961) ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal [remedy] is invoked."), *overruled on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978); *Patsy v. Bd. of Regents*, 457 U.S. 496, 516, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982); *Felder v. Casey*, 487 U.S. 131, 147, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988).

Accordingly, the majority erroneously affirms dismissal of Postema's civil rights action, a dismissal clearly contrary to binding precedent.

## III. Conclusion

The majority disregards the ordinary and usual meaning of the term "impairment" to hold even the slightest effect on surface flows justifies denying a groundwater withdrawal permit application. This approach defeats the meaning of the term "impairment" within its statutory context to the prejudice of the public purpose upon which the entire statute is expressly based. When impairment is given its

ordinary and usual meaning, and read in its statutory context, withdrawals of water which do not conflict with the preservation of the statute's identified interests do not "impair" existing water rights or minimum flows. Moreover, we cannot rationally apply a standard with greater precision than was used to create the standard in the first place. I would therefore remand these cases to the Pollution Control Hearings Board for further proceedings to properly apply the correct standard.

I would also reverse the superior court's dismissal of Postema's equal protection and due process claims. Once Postema obtained a final and adverse decision from the administrative decision maker he was entitled to seek redress for the violation of his rights without regard to the prospect or outcome of judicial review. The majority clearly errs.

For these reasons I dissent.