[No. 31166-6-II.   Division Two.   December 14, 2004.]

YVETTE COLEMAN, ET AL., *Appellants*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

---

*Leslie O. Stomsvik*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Lucretia Fishburn Greer, Assistant*, for respondents.

¶1 BRIDGEWATER, J. — Ronald and Yvette Coleman appeal from an order revoking their foster care license, claiming that substantial evidence does not support an abuse finding, that the revocation based on that abuse was improper, and that substantial evidence does not support a finding that the Colemans lack the suitable character and competence to care for foster children. We affirm.

¶2 Yvette and Ronald[1] obtained a foster care license for their Roy home in 1999, allowing them to care for two children between ages 5 and 17 years of age.[2] In June 2001, the Colemans' daughter, Kristina, missed the activity bus following group photographs of the school color guard. When she did not arrive home at the expected time, Yvette drove to Yelm looking for her.

¶3 She found Kristina walking with two boys and a girl along the street from Yelm Middle School to the Yelm High School. Yvette had previously told Kristina not to associate with the girl because of inappropriate parental supervision. Yvette also noticed that Kristina, who was not allowed to date, was holding hands with a boy Yvette knew had previously been arrested. Kristina explained that she had missed the activity bus, she was trying to find a phone, and that they were going to the middle school to watch a softball game. Yvette suspected that Kristina was lying.

¶4 Yvette ordered Kristina into the car and slapped her across the face, splitting Kristina's lower lip and causing it to bleed. Yvette either pulled Kristina's hair while forcing her into the car (Kristina's explanation) or caught Kristina's hair while pushing on her shoulder to turn her around (Yvette's explanation). Yvette accused Kristina of drinking and disbelieved Kristina's denials. Rather than drive Kristina home, Yvette went to the police station and asked the officer there to administer a breathalyzer test. After the results came back negative, Yvette threatened to

---

[1] We use their first names for ease of reference.

[2] The Colemans do not assign error to any of the Board of Appeals findings of fact and thus we must treat the findings as verities on appeal. RAP 10.3(g); *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 100, 11 P.3d 726 (2000).

perform a body cavity search for drugs. The officer noticed that Kristina's lip was still bleeding.

¶5 Yvette then took Kristina home, where she accused Kristina of taking drugs. Kristina denied it and again insisted that she was trying to call home. Yvette disbelieved Kristina, struck her three to five times on the buttocks with a belt, and sent her to bed. Also, Yvette was determined to withdraw Kristina from middle school, but the next day, Lorene Rang, the principal, persuaded Yvette to at least leave Kristina in school long enough for her to finish her year-end tests so that she could complete her grade.

¶6 Later that next day, Kristina confided in one of her teachers that she was afraid to go home. After her teacher notified Rang and the school counselor, Kristina met with Rang and the counselor and disclosed that her mother had slapped her across the face, pulled her hair while forcing her down into the car, and struck her with a belt. Kristina's lip was still swollen and split at the time. Kristina also met with police officer Todd Stancil and explained to him that her mother had struck her on the side of the body in the kidney area and on her buttocks multiple times and this had caused bruising. Stancil took the word of a woman who had examined Kristina and reported that there were no visible bruises on Kristina's hip or back.

¶7 Stancil then met with the Colemans. Yvette explained that she was upset with Kristina's behavior and admitted slapping Kristina and causing the split lip. Yvette also admitted striking Kristina with the belt, explaining that she folded the belt so that the buckle and open end were in her hand. Stancil then discussed appropriate discipline with the Colemans and allowed them to take Kristina home.

¶8 That same day, Rang filed a Child Protective Services (CPS) report, alleging physical abuse. The next day, she took photographs of Kristina's right side, which had irregular shaped, visible bruises. One week later, an assigned CPS investigator, Ellyn Turner, interviewed Kristina. Kristina again explained that her mother had slapped her

across the face, causing her lip to split, bleed, and swell. Kristina then stated that the bruises on her side resulted from when her mother struck her with the buckle end of the belt. Based on this interview and interviews of Stancil, Yvette, and the school counselor, Turner concluded that the allegation of physical abuse was "founded." Administrative Board Record (BR) at 8.

¶9 The Department of Social and Health Services (DSHS) then notified the Colemans that the physical abuse allegation was "founded" and that the Office of Foster Care Licensing would be contacting them. BR at 11. Yvette requested an internal department review, which upheld the physical abuse finding. Yvette then requested an adjudicative hearing.

¶10 Before the adjudicative hearing took place, DSHS notified the Colemans that it was revoking their jointly held foster care license because Yvette violated the licensing requirements. The Colemans also requested an adjudicative proceeding to contest the license revocation.

¶11 At a hearing to consider both review requests, Kristina testified that she did not know what caused the bruising to her hip area but that she had fallen while in Victoria at a school event and landed hard on that side of her body. Yvette also testified that Kristina had bruised herself in Victoria and explained that Kristina suffers from osteogenesis imperfecta, type I, commonly called brittle bone disease, and, consequently, easily bruises. Yvette explained that she was holding the belt buckle in her hand when she spanked Kristina. She speculated that the bruises could have been caused by the fall in Victoria, holding the flag pole in the color guard, or simply from her pants.

¶12 The Administrative Law Judge (ALJ) conducting the hearing found that Kristina's and Yvette's original statements were more credible than their testimony and found that, on a more likely than not basis, the bruises resulted from the spanking with the belt. The Board of Appeals (Board) upheld the ALJ's determination.

¶13 The superior court upheld both the finding of physical abuse and the license revocation.

¶14 In reviewing administrative action, we sit in the same position as the superior court and apply the Administrative Procedure Act, chapter 34.05 RCW, standards directly to the agency record. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). We review the agency's findings of fact to see if substantial evidence in the record supports them. *Martini v. Employment Sec. Dep't*, 98 Wn. App. 791, 795, 990 P.2d 981 (2000). We review the agency's conclusions of law de novo under an error of law standard. *Williams-Batchelder v. Quasim*, 103 Wn. App. 8, 13, 19 P.3d 421 (2000). And we may reverse the agency decision if it is arbitrary or capricious. RCW 34.05.570(3)(i).

### ABUSE FINDING

¶15 Foster parents cannot use corporal punishment on foster children and DSHS discourages foster parents from using it on their own children because it can negatively affect foster children living in an environment that allows it. But foster parents may not abuse or neglect their own children.

¶16 RCW 26.44.020(12) defines "[a]buse or neglect" as "the injury, sexual abuse, sexual exploitation, negligent treatment, or maltreatment of a child by any person under circumstances which indicate that the child's health, welfare, and safety is harmed."

¶17 Former WAC 388-15-130(3)(a) (2001) defines child abuse:

Abusive, neglectful, or exploitive acts defined in RCW 26.44.020 include:

(a) Inflicting physical injury on a child by other than accidental means, causing death, disfigurement, *skin bruising*, impairment of physical or emotional health, or loss or impairment of any bodily function.

(Emphasis added.)

¶18 Here, it is undisputed that Yvette slapped Kristina, causing her lip to split, swell, and bleed. It is also undisputed that Yvette struck Kristina with a belt multiple times. The record supports the Board's finding that this act, evidenced by admissions, photographs, and statements, bruised Kristina. We find no error in the Board's conclusion that Yvette physically abused Kristina.

¶19 But RCW 26.44.015 limits the reach of the law by providing:

(1) This chapter shall not be construed to authorize interference with child-raising practices, including reasonable parental discipline, which are not injurious to the child's health, welfare, and safety.

(2) Nothing in this chapter may be used to prohibit the reasonable use of corporal punishment as a means of discipline.

(3) No parent or guardian may be deemed abusive or neglectful solely by reason of the parent's or child's blindness, deafness, developmental disability, or other handicap.

¶20 The Colemans argue that the Board failed to make findings that Yvette's actions were (a) unreasonable and (b) injurious to Kristina's health, welfare, and safety. But we need not decide if causing bruising by striking with a belt goes beyond reasonable parental discipline because former WAC 388-15-130(3)(a) defines skin bruising as child abuse for foster care purposes and former WAC 388-73-036(1)(b) (2001) prohibits bruising a child, even one's own child, as a licensing condition. By being licensed foster parents, the Colemans subjected themselves to this requirement.

¶21 Further, in our view former WAC 388-15-130(3)(a), as set out above, necessarily includes a finding that the parent's acts against the child injure the child's health, welfare, and safety. This is especially true here where Yvette struck Kristina with a belt, bruising her, knowing that Kristina's medical condition made her particularly susceptible to injury. Her act was unreasonable and injurious to her daughter. The Board did not err in making a finding of physical abuse.

¶22 DSHS may revoke a foster care license if there is reasonable cause to believe that the licensee "has failed or refused to comply with any provision of chapter 74.15 RCW and RCW 74.13.031, or the requirements adopted pursuant to such provisions." RCW 74.15.130(2)(b).

■ ¶23 Under former WAC 388-73-036(1), DSHS has the authority to deny, suspend, revoke or not renew a license. More specific here, former WAC 388-73-036(1)(b) provides that

> The department *shall* disqualify any individual who has abused, neglected, or sexually exploited a child as those acts or omissions are defined in RCW 26.44.020 and WAC 388-15-130.

(Emphasis added.) *See also* former WAC 388-73-010 (2001) (authority to adopt rules derived from chapter 74.15 RCW); former WAC 388-73-050 (2001) ("Licensees shall protect persons, while in the licensee's care, from child abuse or neglect as defined in RCW 26.44.020(12).").

¶24 As noted above, substantial evidence supported DSHS's finding that Yvette physically abused Kristina under DSHS's definition of abuse as set out in former WAC 388-15-130. As such, revocation was mandatory and we need not discuss DSHS's alternative discretionary basis for revocation. The superior court and the Board of Appeals decisions are affirmed.

QUINN-BRINTNALL, C.J., and HOUGHTON, J., concur.

Review denied at 154 Wn.2d 1027 (2005).